

# Fourth Court of Appeals

## San Antonio, Texas

## OPINION

No. 04-16-00533-CV

Oscar Leo **QUINTANILLA**,
Appellant

v.

Andrew Bradford **WEST**,
Appellee

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2016-CI-06259
Honorable David A. Canales, Judge Presiding

Opinion by:    Rebeca C. Martinez, Justice

Sitting:       Karen Angelini, Justice
               Rebeca C. Martinez, Justice
               Luz Elena D. Chapa, Justice

Delivered and Filed:  April 26, 2017

REVERSED AND REMANDED

Andrew Bradford West sued Oscar Leo Quintanilla for slander of title and fraudulent liens

arising out of Quintanilla's filing of financing statements in the public records to perfect a security

interest in West's assets.  Quintanilla appeals the trial court's order denying his motion to dismiss

the claims under the Texas Citizens Participation Act ("TCPA").[1]  TEX. CIV. PRAC. & REM. CODE

ANN. §§ 27.001-.011 (West 2015).  We conclude the TCPA applies to West's claims, but also

---

[1] A motion to dismiss under the Texas Citizens Participation Act is known as an "Anti-SLAPP" motion; "SLAPP" is an acronym for "Strategic Lawsuits Against Public Participation."  *See Serafine v. Blunt*, 466 S.W.3d 352, 356-57 (Tex. App.—Austin 2015, no pet.).

conclude that West failed to establish a prima facie case for each essential element of his claims. We therefore reverse the trial court's order denying Quintanilla's motion to dismiss the claims and remand to the trial court for entry of an order of dismissal and for calculation of reasonable attorney's fees, costs of court, and other expenses to which Quintanilla is entitled. *See id.* § 27.005(b), (c); *id.* § 27.009(a).

### FACTUAL AND PROCEDURAL BACKGROUND

The basic facts are undisputed. Under a 2011 employment agreement, West served as CEO and President of several businesses owned in whole or in part by Quintanilla throughout Texas. West was offered the right to participate as an owner in some of the businesses he managed on behalf of Quintanilla. The Quintanilla businesses ranged from oil field-related ventures to cattle operations to commercial and residential real estate projects.

The underlying lawsuit arises out of a business dispute involving oil and gas commodity trading accounts managed by West on behalf of Quintanilla from 2011 to late 2014. Quintanilla provided the capital investments in the accounts and West conducted the trading. Profits and losses in the accounts were split 50/50 between Quintanilla and West. After a few years of net profits, West and Quintanilla entered into a letter agreement dated January 1, 2014 regarding West's management of the accounts (the "Commodity Trading Agreement" or "CTA"). The CTA provided for a settlement date on December 31 of each calendar year. On the settlement date, Quintanilla was required to pay West 50% of any profits and West became liable to Quintanilla for 50% of any losses. To effectuate the CTA, West executed a secured promissory note with a maximum loan amount of $5 million (the "CTA Note") and an All-Assets Security Agreement (the "CTA Security Agreement"), both dated January 1, 2014. Under the CTA, all losses incurred by West in the commodities accounts, regardless of the time of year, were automatically deemed borrowed under the CTA Note and secured by the CTA Security Agreement. Under the CTA

Note, it was an event of default if the balance on the note exceeded $5 million. The CTA Note and Security Agreement permitted Quintanilla to perfect his security interest in the assets pledged by West.

During mid to late 2014, the trading accounts began incurring losses due, in part, to falling oil prices. By late 2014, West had incurred over $14 million in trading losses in the accounts, and he was instructed to stop all trading. At the time trading was halted, West's 50% share of the losses was approximately $7 million. On March 1, 2015, Quintanilla, West, and MPC Equipment, LLC, which was a company solely owned by West, entered into an asset purchase agreement (the "Purchase Agreement") under which West conveyed personal assets and MPC Equipment assets to Quintanilla in exchange for Quintanilla's payment of certain debts owed by West. The gist of the current business dispute between Quintanilla and West concerns whether the Purchase Agreement also satisfied West's debt under the CTA, which was memorialized by the CTA Note and secured by the CTA Security Agreement.

West was terminated from all of the Quintanilla businesses in January 2016. In late March and early April 2016, Quintanilla filed a UCC-1 Financing Statement with the Texas Secretary of State and a Memorandum of the CTA Security Agreement in the real property records of McMullen County (collectively, the "Financing Statements") to perfect his security interest in the assets West pledged as collateral for the CTA Note. Those pledged assets included West's overriding royalty interests in several leases and mineral interests in McMullen County, Texas.

Shortly after the Financing Statements were filed, West sued Quintanilla seeking a declaratory judgment that the Purchase Agreement fully satisfied West's obligations under the CTA Note and that "the recorded liens . . . are void *ab initio* and of no legal force or effect." In his petition, West alleged that Quintanilla received assets in the Purchase Agreement with an actual value of $8,883,000, rather than the prescribed value of $4,567,792 which was "intentionally

chosen by Quintanilla's financial advisors and attorneys to minimize the tax implications of the transaction and to satisfy the outstanding balance on the CTA Note." West also asserted claims for slander of title and fraudulent liens under Chapter 9 of the Texas Business and Commerce Code and Chapter 12 of the Texas Civil Practice and Remedies Code, alleging Quintanilla made false or fraudulent statements by filing the Financing Statements in an attempt to collect on the CTA Note, which West contends was discharged. In addition, West sued Quintanilla for breach of the CTA and the Purchase Agreement and for promissory estoppel.

Although the 2015 Purchase Agreement does not mention the CTA debt,[2] West alleged in his petition that the Purchase Agreement transaction was the culmination of months of negotiations between the financial advisors and attorneys for West and Quintanilla concerning how to "best structure the situation to reduce taxes and settle West's obligations under the CTA Note." West further alleged that the Purchase Agreement was expressly structured to permit Quintanilla to claim the full $14 million in trading losses on his 2014 federal tax return and to discharge West's 50% share of the losses as if the CTA agreement never existed. West attached the following documents as exhibits to his petition: (1) the CTA letter agreement; (2) the CTA Note; (3) the CTA Security Agreement; (4) the Purchase Agreement with exhibits; (5) a file folder with handwritten notes in pencil that are scratched out in ink; (6) file-stamped copies of the Financing Statements; and (7) a copy of a letter from Quintanilla's counsel stating he would not pay the next $350,000 installment due to West under the Purchase Agreement. Exhibit Nos. 2 and 3 (the CTA Note and CTA Security Agreement) each show a handwritten note stating "Pd 3-15-15" that West alleged was written by Quintanilla's representative, Marcello Tamez, to show the CTA debt was

---

[2] The parties refer to West's CTA debt as both $7 million, which is 50% of the $14 million loss, and as $5 million, which is the maximum amount allowed under the CTA Note. In Quintanilla's post-submission letter brief, he concedes that West is liable for only $5 million based on the terms of the CTA Note.

discharged. West also alleged the scratched-out handwriting on the file folder (Exhibit No. 5) stated "4/10/15–shared–did not exist–PEP," which referenced his agreement with Quintanilla to "treat the CTA as if it never existed," i.e., the agreement to share trading losses 50/50 never existed.

Quintanilla answered West's petition by filing a general denial. Quintanilla also pled several affirmative defenses, including the parol evidence rule, the statute of frauds, and the merger/integration clause of the Purchase Agreement. In addition, Quintanilla counterclaimed for breach of fiduciary duty, fraud, and breach of the CTA, the CTA Note and the CTA Security Agreement; he also sought judicial foreclosure of the CTA Security Agreement. Quintanilla alleged West induced Quintanilla into hiring him to manage the Quintanilla businesses and then engaged in self-dealing, misrepresentation, breach of fiduciary duty, and fraud.

Quintanilla subsequently filed a motion to dismiss West's claims for slander of title and fraudulent liens. Quintanilla asserted those claims were improper retaliation for the exercise of his rights to free speech and to petition, and thus violated the TCPA. Quintanilla supported his motion to dismiss with the affidavit of Paul Perry, a board member and executive vice president of the Quintanilla businesses as well as the accounting supervisor for Quintanilla and his businesses. Quintanilla also sought recovery of his attorney's fees, court costs, and expenses.

In Paul Perry's affidavit, he states he is personally aware of the debt owed by West to Quintanilla under the CTA. Perry further states the CTA debt had not been "paid, forgiven, discharged or otherwise settled." Perry avers he was directly involved in the negotiation of the Purchase Agreement; is familiar with the assets purchased by Quintanilla and the process by which West's assets were valued by the parties; and he is not aware of any other understanding or arrangement between the parties "concerning the value of the assets." Perry expressly states the CTA debt owed by West was "not in any way addressed or resolved by the March 2015 Purchase Agreement." With respect to the handwritten notes on the CTA Note, CTA Security Agreement,

and file folder, Perry states that he did not personally make or authorize anyone else to make the handwritten notes "Pd 3-15-15" and "4/10/15–shared–did not exist–PEP;" the notes and initials are not made in his handwriting; it is not his practice to "acknowledge the payoff or discharge of obligations, especially obligations under promissory notes" by making such notations; and he did not cancel West's indebtedness under the CTA Note and CTA Security Agreement.

Finally, with respect to the filing of the Financing Statements, Perry states that shortly after West was terminated on January 26, 2016, "it became clear that litigation was likely imminent;" West's attorney began sending letters to Quintanilla as early as February 1, 2016 claiming West was entitled to certain payments under his employment agreement; and counsel for Quintanilla and West exchanged letters "concerning potential disputes between the parties during February and March 2016." Perry avers that Quintanilla took steps to "protect his security interest and rights" under the CTA, the CTA Note and the CTA Security Agreement "after we became reasonably certain that litigation with Mr. West was imminent." Perry states the Financing Statements were filed and recorded "for purposes of protecting Mr. Quintanilla's rights under the [CTA], the Note, and the Security Agreement by, among other things, providing public notice of Mr. Quintanilla's security interests."

West filed a response to the motion to dismiss, asserting the requirements for dismissal under the TCPA were not met. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.003, 27.005 (listing requirements for dismissal). West attached his own affidavit in support. West admits he executed the CTA letter agreement, the CTA Note, and the CTA Security Agreement, and that his 50% share of the losses for 2014 was $7.143 million. West states that instead of formally settling the account on December 31, 2014 as required under the CTA, Quintanilla and he met over the next few months with their financial advisers and attorneys, including Paul Perry and Marcello Tamez, "to determine how to best utilize the situation to reduce taxes and settle my obligations under the

CTA Note." West avers he offered to sell some of his personal assets "to satisfy my obligations under the CTA Note," and the negotiations culminated in the March 2015 Purchase Agreement pursuant to which he conveyed the listed assets to Quintanilla for the "prescribed values," which were lower than the assets' actual values. West asserts the asset values stated in the Purchase Agreement were "intentionally chosen by Quintanilla's financial advisors and attorneys to minimize the tax implications of the transaction and to satisfy the outstanding balance on the CTA Note." West further states the "entire structure of the March 2015 Sale was carefully designed by Quintanilla and his financial advisors and attorneys to allow Quintanilla to claim as many tax losses as possible, which included using my 50% share of the losses under the CTA Note," and he describes how the transaction was structured. West states that as a result of the Purchase Agreement, Quintanilla received approximately $7 million more in value than the nominal values ascribed to the assets, "which was more than enough to satisfy all obligations I owed under the CTA Note."

West also states he asked Marcello Tamez, an attorney involved in the transaction, "what was needed to document that the CTA Note was paid." West states, "Tamez handed me the original CTA, original CTA Note and original CTA Security Agreement with the latter two documents marked 'Paid 3-1-15' and stated to me, 'This is all you need.'" West also avers "[t]he intent behind the transaction was that Quintanilla would get the full $14 million dollar value of the CTA losses and that Quintanilla and I would treat the CTA as if it never existed." As proof, West refers to the copy of a file folder, which he states contained the original CTA documents handed to him by Tamez. According to West, the penciled notation on the file, subsequently scratched out in ink, states, "4/10/15–shared–did not exist–PEP." West states that "PEP" are Paul Perry's initials. West acknowledges the Purchase Agreement does not mention the CTA, the CTA Note, or CTA Security Agreement, but explains the omission was intentional so that Quintanilla could

claim the full $14 million in losses and discharge West's $7 million share "as if the CTA never existed."

After considering the evidence detailed above, and holding a hearing, the trial court denied Quintanilla's motion to dismiss. The trial court made the following findings on each step of the analysis:

> (1) Quintanilla met his burden to establish that the slander of title and fraudulent lien claims fell within the scope of the TCPA; [but]
>
> (2) West established a prima facie case on [each element of] his slander of title and fraudulent lien claims by clear and specific evidence; and
>
> (3) Quintanilla failed to establish his defenses by a preponderance of the evidence.

*See id.* § 27.005.

On appeal, Quintanilla agrees with the trial court that the TCPA applies, but argues that West failed to establish a prima facie case on each element of his slander of title and fraudulent lien claims; therefore, Quintanilla asserts the trial court erred in denying his motion to dismiss. Even if West established a prima facie case, Quintanilla contends he was entitled to a dismissal because he established valid defenses to West's claims by a preponderance of the evidence. *See id.* § 27.008. In response, West argues the trial court properly denied Quintanilla's motion to dismiss because the filing of the Financing Statements does not constitute the exercise of free speech or the right to petition; therefore, the TCPA does not apply to West's claims. And, even if the TCPA applies, West asserts the trial court correctly found that he established a prima facie case on each element of his slander of title and fraudulent lien claims and that Quintanilla failed to establish his defenses by a preponderance of the evidence.

### MOTION TO DISMISS UNDER TEXAS CITIZENS PARTICIPATION ACT

The stated purpose of the TCPA is to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the

maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM. CODE ANN. § 27.002. The TCPA protects citizens who "petition or speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them." *In re Lipsky*, 460 S.W.3d 579, 584 (Tex. 2015) (orig. proceeding). Toward that purpose, the statute provides for the expedited dismissal of a legal action that implicates a defendant's right of free speech, or other First Amendment right such as the right to petition, when the plaintiff cannot establish the threshold requirement of a prima facie case on his claims. TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.003, 27.005(b),(c). A successful motion to dismiss under the TCPA entitles the movant to an award of court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action. *Id.* § 27.009(a).

The filing of a motion to dismiss under the TCPA triggers a three-step burden shifting mechanism. *In re Lipsky*, 460 S.W.3d at 586-87; *Avery v. Baddour*, No. 04-16-00184-CV, 2016 WL 4208115, at *2 (Tex. App.—San Antonio Aug. 10, 2016, pet. denied) (mem. op.). As the movant, Quintanilla had the initial burden to show by a preponderance of the evidence that West's "legal action is based on, relates to, or is in response to [Quintanilla's] exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b). Once Quintanilla satisfied this burden, the trial court was required to dismiss the legal action unless West "establishe[d] by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). If West satisfied his burden, the burden then shifted back to Quintanilla to establish by a preponderance of the evidence each essential element of a valid defense to the claim. *Id.* § 27.005(d).

In determining whether a plaintiff's claim should be dismissed, the court may consider the pleadings and any supporting and opposing affidavits stating the facts on which the liability or defense is based. *Id.* § 27.006(a); *see In re Lipsky*, 460 S.W.3d at 587; *see also Rio Grande H2O*

- 9 -

*Guardian v. Robert Muller Family P'ship Ltd.*, No. 04-13-00441-CV, 2014 WL 309776, at \*3 (Tex. App.—San Antonio Jan. 29, 2014, no pet.) (mem. op.) (stating that "[u]nlike other types of cases where pleadings are not considered evidence, section 27.006 of the Act, which is entitled 'Evidence,' expressly provides . . . the court shall consider the pleadings" as evidence in determining whether the legal action should be dismissed). The trial court does not hear live testimony. *In re Lipsky*, 460 S.W.3d at 587. The appellate court conducts a *de novo* review of the trial court's ruling on a TCPA motion to dismiss. *Herrera v. Stahl*, 441 S.W.3d 739, 741 (Tex. App.—San Antonio 2014, no pet.) (appellate court reviews each step of the TCPA analysis de novo).

### 1) Does the TCPA Apply?

The trial court found that Quintanilla met his initial burden to prove by a preponderance of the evidence that his action in filing the Financing Statements was protected First Amendment activity under the TCPA as the exercise of free speech and/or the right to petition. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b)(1), (2) (requiring proof that the legal action is "based on, relates to, or is in response to" the other party's exercise of the right to free speech, to petition, or to associate). Proof by a "preponderance of the evidence" means the greater weight and degree of credible evidence that would create a reasonable belief in the truth of the matter. *Herrera*, 441 S.W.3d at 741. Both parties agree that no Texas case has yet determined whether the filing of a financing statement or lien is protected First Amendment activity under the TCPA. In determining this issue, we are mindful of the Legislature's instruction that the TCPA "shall be construed liberally to effectuate its purpose and intent fully." TEX. CIV. PRAC. & REM. CODE ANN. § 27.011(b).

*Filing of Financing Statement as Exercise of "Right to Free Speech"?*

The TCPA defines the exercise of free speech as "a communication made in connection with a matter of public concern." *Id.* § 27.001(3). Quintanilla and West agree the Financing Statements constitute "communications" as defined by the statute, but they disagree whether they relate to a "matter of public concern" rather than a private matter between a creditor and a borrower. *See id.* § 27.001(1) (defining "communication").

Section 27.001(7) lists several "matters of public concern." Quintanilla relies on the public notice purpose of the lien recordation system in arguing the Financing Statements fit within subsection (7)(B), which provides that "an issue related to . . . economic, or community well-being" constitutes a matter of public concern, and subsection (7)(E), which provides that "an issue related to . . . a good, product, or service in the marketplace" constitutes a matter of public concern. *Id.* § 27.001(7)(B), (E). Quintanilla contends that a financing statement is a communication intended to place potential buyers on notice that the property is or may be encumbered, and that its filing in the public records serves to protect innocent purchasers in the marketplace; therefore, it is speech that relates to a matter of public concern. *See First Valley Bank of Los Fresnos v. Martin*, 144 S.W.3d 466, 472 n.25 (Tex. 2004); *see also Crow-Southland Joint Venture No. 1 v. N. Fort Worth Bank*, 838 S.W.2d 720, 724 (Tex. App.—Dallas 1992, writ denied) (purpose of filing financing statement is to put third party on notice of potential lien or security agreement); *see also* TEX. PROP. CODE ANN. § 13.002 (West 2014) (purpose of a recorded instrument is "notice to all persons of the existence of the instrument").

West's position is that individual creditors record liens to protect and secure their own interests, not the public's interests. West asserts that a security interest and financing statement arise out of a private business transaction and represent the effort of an individual creditor to secure and ultimately collect a debt against an individual debtor. West relies on Texas cases holding that

statements made in the context of private business disputes do not constitute speech related to a matter of public concern under the TCPA.[3] West also relies on California cases holding the filing of a lien does not constitute free speech under the California anti-SLAPP statute.[4]

We review issues of statutory interpretation de novo. *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015) (per curiam); *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011). In interpreting the statutory language of section 27.001(7), we apply the standard principles of statutory interpretation to determine whether the Legislature intended to include financing statements within its scope. *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439-41 (Tex. 2011) (court looks to statute's plain language to discern legislature's intent, giving the text its plain meaning unless a different meaning is supplied by statutory definition or is apparent from the context, or the plain meaning leads to absurd results); *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). If the statute's language is unambiguous, we interpret it according to its plain meaning. *Lippincott*, 462 S.W.3d at 509. At least one court has held that the statutory definition of subjects that qualify as a "matter of public concern" under

---

[3] *See Brugger v. Swinford*, No. 14-16-00069-CV, 2016 WL 4444036, at *3 (Tex. App.—Houston [14th Dist.] Aug. 23, 2016, no pet.) (mem. op.) (lawyer's allegedly defamatory statements to shareholders about a corporate officer were made in course of dispute between the shareholders and corporation, and were not communications in connection with a matter of public concern); *Lahijani v. Melifera Partners, LLC*, No. 01-14-01025-CV, 2015 WL 6692197, at *4 (Tex. App.—Houston [1st Dist.] Nov. 3, 2015, no pet.) (mem. op.) (statements critical of real estate agent with respect to commission and sharing of expenses in real estate joint venture did not relate to a "service in the marketplace," but were limited to the private business dispute, and were therefore not made in connection with a matter of public concern under the TCPA); *I-10 Colony, Inc. v. Lee*, Nos. 01-14-00465-CV & 01-14-00718-CV, 2015 WL 1869467, at *5 (Tex. App.—Houston [1st Dist.] Apr. 23, 2015, no pet.) (mem. op.) (fraud claim was not based on communications about lawyer's services in the marketplace, but on allegation that defendant lawyer fraudulently represented to plaintiff that the lawyer would comply with a previous judgment; therefore, TCPA did not apply).

[4] *See Slusher v. Dameron Hosp. Assoc.*, No. C072875, 2015 WL 3941199, at *3 (Cal. Ct. App. June 26, 2015) (unpublished/noncitable) (holding hospital lien filed in plaintiffs' lawsuit against third party to secure payment of hospital bill was "issued to facilitate business collections, not to engage in speech on a public issue" and anti-SLAPP statute did not apply); *see also A.F. Brown Elec. Contractor, Inc. v. Rhino Elec. Supply, Inc.*, 137 Cal. App. 4th 1118, 1127-29 (Cal. Ct. App. 2006) (holding electrical supplier's issuance of a stop notice, which was equivalent to a mechanic's lien, was not filed in, or in anticipation of, an "official proceeding," and thus did not concern a "public issue" under the California anti-SLAPP statute, but merely a private collection dispute between the electrical contractor and subcontractor).

section 27.001(7) is not ambiguous, and will be enforced as written. *Better Business Bureau of Metropolitan Dallas, Inc. v. BH DFW, Inc.*, 402 S.W.3d 299, 308 (Tex. App.—Dallas 2013, pet. denied). "We presume the Legislature included each word in the statute for a purpose and that words not included were purposefully omitted." *Lippincott*, 462 S.W.3d at 509 (noting the TCPA applies a broad definition of "the exercise of the right of free speech" as a "communication made in connection with a matter of public concern," which it then defines as including five subjects).

The supreme court recently clarified in *ExxonMobil Pipeline Co. v. Coleman* that, "[t]he TCPA does not require that the statements specifically 'mention' health, safety, environmental, or economic concerns, nor does it require more than a 'tangential relationship' to the same; rather, TCPA applicability requires only that the defendant's statements are 'in connection with' 'issue[s] related to' health, safety, environmental, economic, and other identified matters of public concern chosen by the Legislature." *ExxonMobil Pipeline Co. v. Coleman*, No. 15-0407, 2017 WL 727274, at *3 (Tex. Feb. 24, 2017) (per curiam).

Turning first to whether the Financing Statements were communications made "*in connection with*" "*an issue related to*" a "good, product, or service in the marketplace," we conclude that their filing provided notice to the public of an encumbrance on West's mineral interests offered for sale in the public marketplace, and therefore related to a "matter of public concern" under subsection (7)(E). *See id.*; TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3), (7)(E) (emphasis added). Several cases have construed the scope of subsection (7)(E) and held it applies to public or private communications related to the provision of medical services to the public by a healthcare professional and the provision of legal services to the public by a licensed attorney. *See Lippincott*, 462 S.W.3d at 510 (holding that internal emails sent by administrators at a medical facility that contained disparaging comments about a nurse anesthetist related to a "matter of public concern," i.e., the provision of medical services by a healthcare professional, and constituted the

exercise of free speech under the TCPA); *see also Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 81 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (holding that newspaper articles directly related to assisted living facility's obligations to fulfill licensing requirements and regulation standards, which reflected a specific public concern of ensuring that assisted living residents retained the right to choose own healthcare providers, and therefore amounted to the exercise of free speech within the scope of the TCPA); *see also Deaver v. Desai*, 483 S.W.3d 668, 673 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (website dedicated to criticism of attorney addressed the attorney's legal services which were offered on the public marketplace, and qualified as a communication made in connection with a matter of public concern, i.e., the exercise of free speech within scope of TCPA); *see also Avila v. Larrea*, 394 S.W.3d 646, 655 (Tex. App.——Dallas 2012, pet. denied) (communication on television about lawyer's handling of cases was a matter of public concern because it related to lawyer's services in the marketplace).

With respect to a sale of real property in the marketplace, in *Schimmel v. McGregor*, homeowners sued the homeowners' association's attorney for tortious interference in connection with the sale of their respective beachfront properties to the City of Galveston. The Houston court of appeals held the attorney's statements to the city were a matter of public concern, and thus the exercise of free speech protected by the TCPA, because they were related to the dispute between the individual homeowners and the homeowners' association about the city's purchase of the properties, specifically whether the sale would damage the values of neighboring properties and the future revenue stream of the association. *Schimmel v. McGregor*, 438 S.W.3d 847, 858-59 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

Based on the foregoing, we conclude that more than a preponderance of the evidence shows the communications made by Quintanilla in the form of the Financing Statements were made "in

connection with" "issues related to" real property offered for sale in the public marketplace, and therefore related to a matter of public concern. *See ExxonMobil Pipeline*, 2017 WL 727274, at *3; *see also Matagorda Cty. Appraisal Dist. v. Coastal Liquids Partners, L.P.*, 165 S.W.3d 329, 332 (Tex. 2005). Quintanilla was therefore exercising his right to free speech when he filed the Financing Statements, and they are protected activity within the TCPA. TEX. CIV. PRAC. REM. CODE ANN. § 27.001(3), (7).

### *Filing of Financing Statement as Exercise of "Right to Petition"?*

In the interest of completeness, we will also address whether the filing of the Financing Statements falls within the scope of the right to petition under the TCPA. Unlike the right of free speech under the TCPA, exercise of the right to petition need not involve a matter of "public concern." In relevant part, the TCPA defines the exercise of the right to petition as "(A) a communication in or pertaining to: (i) a judicial proceeding." *Id.* § 27.001(4)(A)(i).

We consider the pleadings, along with their exhibits, and the affidavits as evidence in determining whether Quintanilla proved by a preponderance of the evidence that West's claims are based on, relate to, or are in response to a communication by Quintanilla "in or pertaining to a judicial proceeding," i.e., in exercise of his right to petition. *See id.* §§ 27.001(4)(A)(i), 27.003(a); *see also Serafine v. Blunt*, 466 S.W.3d 352, 360 (Tex. App.—Austin 2015, no pet.). It is undisputed that there was no pending litigation between West and Quintanilla when the Financing Statements were filed; therefore, there is no evidence they were communications made "*in* a judicial proceeding." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(A)(4)(i). However, Quintanilla did present evidence showing that litigation with West over the CTA Note was impending at the time the Financing Statements were filed, and that the Financing Statements therefore "*pertained to* a judicial proceeding." *See id.*

Quintanilla attached to his answer two demand letters he sent to West during the two months preceding the filing of the Financing Statements, and after West's termination. The first letter dated February 29, 2016 notified West that the CTA Note had matured due to his termination and demanded payment in full no later than March 12, 2016. The letter also stated that if West failed to pay, Quintanilla would proceed to exercise any remedies available to him under the loan documents and at law and in equity. The second letter dated March 21, 2016 informed West that the CTA Note was in default due to his failure to make the payment. The Financing Statements were filed on April 1, 2016. Finally, Perry stated in his affidavit that the Financing Statements were filed "to protect his [Quintanilla's] security interest and rights under the Commodities Agreement, the Note, and the Security Agreement after we became reasonably certain that litigation with Mr. West was imminent."

The activity by Quintanilla that forms the gravamen of West's slander of title and fraudulent lien claims is the recording of the Financing Statements in the public records. Quintanilla's demand letters to West and Perry's affidavit show the Financing Statements were made and filed in anticipation of imminent litigation with West over the CTA debt. Accordingly, we conclude that Quintanilla proved by a preponderance of the evidence that the Financing Statements were filed in the context of impending litigation between Quintanilla and West over payment of the CTA Note, and therefore they were made in exercise of the right to petition. *See* TEX. CIV. PRAC. REM. CODE ANN. § 27.001(4)(A)(i) (communications "in or pertaining to" a judicial proceeding constitute exercise of right to petition); *see also Serafine*, 466 S.W.3d at 360 (counterclaim for fraudulent lien was based on, related to, or in response to Serafine's filing of lis pendens in county records, which was a "communication in or pertaining to a judicial proceeding"); *Martin v. Bravenec*, No. 04-14-00483-CV, 2015 WL 2255139, at *6 (Tex. App.—San Antonio May 13, 2015, pet. denied) (mem. op.) (plaintiffs' tortious interference claim based

on Martin's repeated filing of lis pendens and other documents against the subject property was related to Martin's exercise of the right to petition under sections 27.001(4)(A)(i) and (4)(B) of the TCPA); *James v. Calkins*, 446 S.W.3d 135, 147-48 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (claim for fraudulent lien was based on, related to, or in response to the notice of lis pendens filed with the district clerk and therefore related to the exercise of the right to petition under section 27.001(4)(A)(i) of the TCPA).

### 2) Did West Establish a Prima Facie Case on Slander of Title and Fraudulent Lien Claims?

Having concluded Quintanilla met his burden to prove the TCPA applies to West's claims for slander of title and fraudulent liens, we proceed to the next step of the analysis to determine whether West met his burden to establish a prima facie case on each essential element of those claims. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c).

#### Applicable Standard of Proof

To defeat a motion to dismiss, the plaintiff must establish by "clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* The term "prima facie case" generally refers to a minimal factual burden and consists of the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Lipsky*, 460 S.W.3d at 590; *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (orig. proceeding). Prima facie evidence is evidence that is "sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *Lipsky*, 460 S.W.3d at 590. Conclusory statements are not probative and will not suffice to establish a prima facie case. *Id.* at 592 ("bare, baseless opinions" are not "a sufficient substitute for the clear and specific evidence" required by the TCPA); *In re E.I. DuPont*, 136 S.W.3d at 223-24.

In *Lipsky*, the supreme court acknowledged the TCPA does not define the phrase "clear and specific evidence," and it is not a recognized evidentiary standard. *Lipsky*, 460 S.W.3d at 588-

89. The court therefore referred to the plain or common meaning of the words "clear" and "specific" as, respectively, "unambiguous, sure, or free from doubt," and "explicit" or "relating to a particular named thing." *Id.* at 590. Establishing a prima facie case by "clear and specific evidence" therefore requires more than mere notice pleading in that "a plaintiff must provide enough detail to show the factual basis for its claim." *Id.* at 590-91 (acknowledging the TCPA initially demands more information from the plaintiff about the claim, but rejecting the argument that the statute imposes an elevated evidentiary standard). "[T]he term 'clear and specific evidence' refers to the quality of evidence required to establish a prima facie case, while the term 'prima facie case' refers to the amount of evidence required to satisfy the nonmovant's minimal factual burden." *Serafine*, 466 S.W.3d at 358. Circumstantial evidence and rational inferences may be considered part of the "clear and specific evidence" necessary to establish a prima facie case under the TCPA. *Lipsky*, 460 S.W.3d at 589-90.

### *Application of Parol Evidence Rule*

Quintanilla argues on appeal that the trial court erred in ruling that West established a prima facie case on his slander of title and fraudulent lien claims because the only evidence West presented that the CTA debt was discharged was inadmissible parol evidence outside the Purchase Agreement. Quintanilla contends West's statements that the CTA debt was discharged through the Purchase Agreement transaction, along with the CTA Note, CTA Security Agreement, and file folder with the handwritten notations "Pd 3-15-15" and "4/10/15–shared–did not exist–PEP," contradict the express terms and purchase price stated in the unambiguous March 2015 Purchase Agreement. Quintanilla asserts that all of West's evidence about an unwritten side agreement to discharge West's $7 million share of the CTA debt, and allow Quintanilla to claim the full $14 million tax loss, through the asset-valuation structure in the Purchase Agreement is inadmissible

parol evidence. Quintanilla raised the same parol evidence objection and argument in the trial court.

The general rule for an unambiguous contract is that its interpretation is controlled by the four corners of the agreement, and extrinsic evidence of prior or contemporaneous agreements is inadmissible as parol evidence. *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 875 (Tex. 2010); *Audubon Indemnity Co. v. Custom Site-Prep, Inc.*, 358 S.W.3d 309, 316 (Tex. App. —Houston [1st Dist.] 2011, pet. denied). Parol evidence cannot be used to create ambiguity. *David J. Saks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008); *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). "The parol evidence rule is a rule of substantive law which provides that in the absence of fraud, accident, or mistake, extrinsic evidence is not admissible to vary, add to, or contradict the terms of a written instrument that is facially complete and unambiguous." *Pitman v. Lightfoot*, 937 S.W.2d 496, 515-16 (Tex. App.— San Antonio 1996, writ denied). West did not argue in the trial court that the Purchase Agreement is ambiguous.

West asserts that his evidence that the CTA debt was discharged falls within an exception to the parol evidence rule. First, West contends his factual assertions of an unwritten agreement to discharge his CTA debt, and permit Quintanilla to claim the full CTA tax loss, through the asset-valuation in the Purchase Agreement do not violate the parol evidence rule because they "correct the consideration" that was misstated in the Purchase Agreement. *See Audubon Indem.*, 358 S.W.3d at 316 (parol evidence may be considered "to show want or failure of consideration, and to establish the real consideration for an instrument"). Second, West asserts his evidence shows a "collateral agreement" that is consistent with the Purchase Agreement. *See Swinnea*, 318 S.W.3d at 875 (holding oral agreement that lease obligation was to be additional consideration for the

buyout did not "contradict the written contracts" and was therefore not barred by parol evidence rule).

We disagree that either exception applies. The Purchase Agreement is an unambiguous, stand-alone, written contract that details the assets transferred by West and each of the components of the consideration provided by Quintanilla. Even though it expressly designates other debts owed by West as part of the consideration,[5] the Purchase Agreement makes no mention of the CTA Note. The Purchase Agreement contained multiple exhibits necessary to its consummation, but no document pertaining to the CTA Note. Moreover, as Quintanilla points out, the CTA Note and CTA Security Agreement expressly forbid "repayment by loan forgiveness or tax consequences." West's evidence that the CTA debt was informally forgiven by Quintanilla as part of the consideration he paid under the Purchase Agreement thus directly conflicts with the terms of the CTA Note, as well as the detailed consideration terms of the Purchase Agreement itself. West's extrinsic evidence does not simply "correct" the stated consideration, or the manner of satisfying it, but rather substantially varies the most fundamental term of the Purchase Agreement, the purchase price, by adding $5 million, or even $7 million, to the approximately $4 million purchase price stated in the agreement.

With respect to West's argument that forgiveness of the CTA Note was a "consistent, collateral agreement," the Purchase Agreement contains a clause providing that any prior or other agreements between the parties were merged with and integrated into the final Purchase Agreement. The parol evidence rule "particularly applies when the written contract includes a

---

[5] Section 6 of the Purchase Agreement lists the components of the $4,567,791 purchase price to be paid by Quintanilla, including: (i) his payment of a promissory note by West made payable to Carey Ann Charley West in the amount of $2,200,000, plus interest; (ii) his payment of seven designated debts owed by West and/or MPC Equipment in the form of loans, credit card charges, equipment repair charges, cash calls, etc.; (iii) his payment of a personal note receivable from West with a principal balance of $72,134; and (iv) his payment of a $1,000,000 tax payment to West to cover his federal income taxes due with respect to the Purchase Agreement transaction.

merger clause or similar language." *See Audubon Indem.*, 358 S.W.3d at 316. Further, as noted above, the purported side agreement discharging the CTA Note does not fall within the exception for a consistent collateral agreement because it is instead inconsistent with, and varies or contradicts, the express terms of the Purchase Agreement. *C.f.*, *Hubacek v. Ennis State Bank*, 159 Tex. 166, 317 S.W.2d 30, 32 (1958) (parol evidence rule "does not preclude enforcement of prior or contemporaneous agreements which are collateral to an integrated agreement and which are not inconsistent with and do not vary or contradict the express or implied terms or obligations thereof"); *see also Swinnea*, 318 S.W.3d at 875 (quoting *Hubacek*). Further, any argument by West that the alleged agreement with Quintanilla to discharge the CTA Note was made *subsequent* to the Purchase Agreement, which closed on March 1, 2015, directly contradicts the factual allegations West made in his petition and swore to in his affidavit — that the parties' negotiations in early 2015 concerning the $14 million in tax losses and discharge of West's share of the losses "culminated in the March 2015 Purchase Agreement."

Based on the foregoing, we conclude the parol evidence rule bars consideration of West's statements in his petition and affidavit that his obligations under the CTA Note were discharged by Quintanilla as part of the March 2015 Purchase Agreement transaction, and the CTA Note, CTA Security Agreement, and file folder with the handwritten notes purportedly showing the CTA debt was "paid" or "did not exist." *See Hubacek*, 317 S.W.2d at 31 (parol evidence rule applies to any inconsistent agreement whether written or oral).

### *Elements of West's Claims*

West was required to present "clear and specific" evidence on the following elements of his slander of title claim: (i) Quintanilla published a false statement (ii) maliciously and (iii) the statements caused special damages to West's interest in land. *HMC Hotel Props. II L.P. v. Keystone-Tex. Prop. Holding Corp.*, No. 04-10-00620-CV, 2011 WL 5869608, at \*10 (Tex.

App.—San Antonio Nov. 23, 2011), *rev'd in part on other grounds*, 439 S.W.3d 910 (Tex. 2014); *Santa Fe Energy Op. Partners, L.P. v. Carrillo*, 948 S.W.2d 780, 785 (Tex. App. —San Antonio 1997, writ denied). Slander of title requires proof of "legal malice," which is defined as "making false statements regarding title in [the] absence of color of title or a reasonable belief that parties have title." *Santa Fe*, 948 S.W.2d at 785. In his petition, West alleged that Quintanilla "uttered or published a disparaging statement about the title and interest in and to [West's property] by filing or causing to be filed the Quintanilla Liens" and that "[t]hese statements or utterances were false and published with legal malice in that Quintanilla knew or should have known that the Quintanilla Liens were invalid and improper due to the closing of the March 2015 Sale whereby West satisfied all obligations under the CTA Note."

West's fraudulent lien claim under the Business and Commerce Code required "clear and specific evidence" that (i) Quintanilla intentionally or knowingly (ii) filed a financing statement (iii) that Quintanilla knew contained a material false statement or was groundless. TEX. BUS. & COM. CODE ANN. § 9.5185(a) (West 2011). Similarly, to establish a prima facie case on his fraudulent lien claim under the Civil Practice and Remedies Code, West was required to show that Quintanilla (i) made, presented, or used the Financing Statements with knowledge that they were a fraudulent lien, (ii) intended the documents to be given the same legal effect as a court document evidencing a valid lien, claim, or interest in West's property, and (iii) intended to cause financial injury to West. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 12.002(a); *see also Serafine*, 466 S.W.3d at 363. In his petition, West alleged that, "by recording the Quintanilla Liens, Quintanilla made, presented, or used documents . . . with knowledge that the documents . . . were fraudulent as against real and personal property owned by West with the intent that the documents . . . be given legal effect" and "with the intent to cause West physical injury, financial injury or mental anguish or emotional distress."

A common element among all of the above causes of action is proof of a false or fraudulent statement by Quintanilla. Each of the claims is based on the same factual allegation by West — that his obligations under the CTA Note and CTA Security Agreement were discharged as a result of the March 2015 Purchase Agreement. Exhibit Nos. 2, 3, and 5 containing the handwritten notations "paid" and "did not exist," and West's statements in his petition and affidavit, constitute all of the evidence presented by West to show that Quintanilla did not have a valid security interest under the CTA Note and CTA Security Agreement, and therefore filed "false or fraudulent" financing statements and "maliciously published a false statement" regarding West's title to real property. Because we have concluded that such evidence is inadmissible parol evidence, we may not consider it. Without such evidence, West has presented no evidence of the essential element of a false or fraudulent statement required to make a prima facie case on his slander of title and fraudulent lien claims. West has therefore failed to meet his burden to defeat Quintanilla's motion to dismiss his claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c). Accordingly, our analysis ends here and we need not proceed to the third step of the analysis.

## CONCLUSION

Based on the foregoing reasons, we conclude that the TCPA applies to West's claims for slander of title and fraudulent liens, but further conclude that West failed to establish a prima facie case on each essential element of those claims. Accordingly, the trial court's order denying Quintanilla's motion to dismiss is reversed.[6] *See* TEX. CIV. PRAC. REM. CODE ANN. § 27.005(b), (c). The cause is remanded to the trial court for entry of an order dismissing the claims and for

---

[6] In his brief, West raised an alternative argument that the TCPA is unconstitutional. Specifically, West argued subsection 27.006(a)'s requirement that the trial court may only consider written evidence, and may not hear live witness testimony, violates the open courts provision, due process, and due course of law provisions under the federal and Texas constitutions. However, West's constitutional argument is waived because it was not presented to the trial court. TEX. R. APP. P. 33.1(a); *Avery v. Baddour*, No. 04-16-00184-CV, 2016 WL 4208115, at *6 n.5 (Tex. App.— San Antonio Aug. 10, 2016, pet. denied) (mem. op.).

calculation of reasonable attorney's fees, costs of court, and other expenses incurred in defending against the legal action which shall be awarded to Quintanilla as the successful movant. TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a)(1); *Sullivan v. Abraham*, No. 14-0987, 2016 WL 1513674, at *4 (Tex. Apr. 15, 2016).

Rebeca C. Martinez, Justice