# IN THE SUPREME COURT OF TEXAS

══════════

No. 17-0454

══════════

ANDREW BRADFORD WEST, PETITIONER,

v.

OSCAR LEO QUINTANILLA, RESPONDENT

════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

════════════════════════════════════════════

**Argued January 9, 2019**

JUSTICE BOYD delivered the opinion of the Court.

JUSTICE BUSBY did not participate in the decision.

The plaintiff in this case claims that after he fully satisfied his debt to the defendant, the defendant filed fraudulent liens and slandered the plaintiff's title to mineral interests that secured that debt. The defendant argues, and the court of appeals agreed, that the parol evidence rule bars evidence and enforcement of the agreement through which the plaintiff claims to have satisfied the debt. Because we disagree, we reverse the court of appeals' judgment and remand the case for that court to consider arguments it did not reach.

## I.
## Background

This case involves three agreements between former business partners Brad West and Leo Quintanilla. The first agreement, which we will call the 2014 Trading Agreement, is not disputed.

While employed as CEO and manager of several of Quintanilla's businesses, West also traded commodities using funds Quintanilla deposited in an account for that purpose. In early 2014, West and Quintanilla formalized that arrangement by executing a "Commodity Trading Agreement" (CTA). The parties agreed in the CTA that Quintanilla would provide $5 million, West would use those funds for trading, and the two would equally share any profits or losses at the end of each calendar year. To cover his share of any losses, West executed a promissory note for an amount up to $5 million and a separate agreement pledging all of his personal assets to secure that note. The parties do not dispute that these three separate documents—the CTA, the promissory note, and the security agreement—memorialize the parties' 2014 Trading Agreement.

The second agreement—a written Purchase Agreement dated March 1, 2015—is also undisputed. The 2015 Purchase Agreement details the terms of West's agreement to sell certain assets to Quintanilla, including equipment, claims, contracts, and ownership interests in various business entities. The 2015 Purchase Agreement stated a total purchase price of just over $4.5 million. A "reference spreadsheet" incorporated into the written agreement provided further detail, listing the estimated value, purchase price, estimated cost basis, gain or loss, tax rate, and tax projected as to each of the assets.[1] Quintanilla agreed to pay the total purchase price by forgiving

---

[1] Specifically, the spreadsheet identified the following:

| ASSET | Est. value | Purchase price | Cost basis | Gain/loss | Tax rate | Proj. tax |
|---|---|---|---|---|---|---|
| MPC equipment | $2,907,000 | $1,765,006 | $468,676 | $1,296,330 | 40% | $518,532 |
| McCoy surface interest | $300,000 | $300,000 | $121,000 | $179,000 | 20% | $35,800 |
| Q2W Investments | $34,000 | $34,000 | $34,000 | 0 | 20% | 0 |
| McCoy Minerals | $50,000 | $50,000 | $50,000 | 0 | 20% | 0 |
| Q2BW King Air | $123,000 | $123,000 | $123,000 | 0 | 20% | 0 |
| Dual Air Charter 26% | $13,000 | $13,000 | $13,000 | 0 | 20% | 0 |
| QMSTS stock | $2,500,000 | $2,282,786 | 0 | $2,282,786 | 20% | $456,557 |
| TOTAL | $5,927,000 | $4,567,792 | $809,676 | $3,758,116 | | $1,010,889 |

or paying certain debts that West or his companies owed to Quintanilla or third parties, along with a $1 million payment directly to West, either in lump sum or quarterly installments, to cover the projected taxes West would owe as a result of the sale.[2] The 2015 Purchase Agreement includes an "Entire Agreement" clause, providing that the agreement "and each other agreement contemplated to be executed and delivered hereunder constitute the entire agreement between the Parties and supersede any prior understandings or agreements by or between the Parties, written or oral, to the extent they relate in any way to the subject matter hereof." The 2015 Purchase Agreement does not mention the 2014 Trading Agreement or West's debt to Quintanilla under that agreement.

The third agreement—an oral arrangement West refers to as the March 2015 Sale—is disputed, although the facts leading up to it are not. West had traded profitably with Quintanilla's money in 2011, 2012, and 2013, but he was not successful in 2014. By the time West stopped trading near the end of that year, the total losses exceeded $14 million. West was liable for half that amount under the CTA and owed Quintanilla $5 million under the promissory note, secured by his personal assets.

---

[2] A "Funds Flow Memorandum" incorporated into the 2015 Purchase Agreement summarized Quintanilla's payments as follows:

| | |
|---|---|
| Payment of West's debts to various Quintanilla entities | $1,043,568 |
| Payment of West's debt to Quintanilla personally | $72,134 |
| Payment of West's company's debt to a bank | $206,255 |
| Payment of West's debt to his ex-wife | $2,245,833 |
| Payment to West for projected tax liability | $1,000,000 |
| TOTAL: | $4,567,791 |

3

West alleges that the March 2015 Sale was an oral agreement through which he fully satisfied the $7 million he owed Quintanilla under the 2014 Trading Agreement. According to West, the March 2015 Sale involved two key components. First, West agreed that Quintanilla could claim the entire $14 million in trading losses on his 2014 tax return, allowing Quintanilla to save an additional $3 million in taxes. Second, West agreed to sell several of his assets to Quintanilla for a price that was about $4.3 million less than their fair market value. According to West, the 2015 Purchase Agreement memorializes the details of this sale, which provided the second component of the March 2015 Sale. West asserts that Quintanilla agreed that the two components together more than satisfied West's $7 million debt, and the parties and their lawyers and tax advisors carefully structured the March 2015 Sale to satisfy the $7 million debt in a way that would minimize Quintanilla's tax liabilities and allow both parties to proceed as if the 2014 Trading Agreement had never existed.

West alleges that Quintanilla agreed to and acted in accordance with all of the March 2015 Sale's terms. Under the first component, Quintanilla claimed the $14 million in trading losses, realizing over $3 million in additional tax savings.[3] And under the second component, Quintanilla gained a $4.3 million profit through the 2015 Purchase Agreement. When West requested confirmation that he had satisfied the $7 million debt through the March 2015 Sale, Quintanilla's

_____

[3] In one paragraph of his affidavit, West says that Quintanilla "was permitted" to take the full tax loss and "realized" over $3 million in tax savings. In another paragraph, he asserts only "[u]pon information and belief" that Quintanilla actually claimed the full losses on his 2014 tax return. At oral argument, West's attorney asserted that the record establishes that Quintanilla "took [the full loss's] benefit," while Quintanilla's attorney said he "believes he did." In a post-argument submission, Quintanilla's attorney noted that Quintanilla provided all of the $14 million that was lost and added that any "tax consequences of this loss implicate facts outside the limited record before this Court." Regardless of whether Quintanilla actually claimed the full $14 million loss on his tax return, West's pleadings and evidence are at least sufficient to establish a prima facie case that the parties entered into an agreement that gave Quintanilla the right to claim all of the losses.

general counsel—who was also West's personal lawyer—handed West the originals of the three documents that made up the 2014 Trading Agreement. On the first and last pages of both the promissory note and the security agreement, someone handwrote "Pd 3-1-15." The lawyer delivered these documents to West in a folder on which was handwritten, "4/10/15 -shared deal - did not exist PEP," and told West "this is all you need" to confirm West had paid the debt.[4] West contends that Quintanilla thus surrendered the note and confirmed that West had satisfied his $7 million debt in a way that allowed the parties to act as if the 2014 Trading Agreement never existed.

West testified that, through the rest of 2015, both parties acted consistently with the March 2015 Sale. For example, some of his prior commodities investments paid off in 2015, resulting in a net gain of around $3 million, but West neither expected nor received any share of those profits. For reasons the parties hotly dispute, however, their relationship deteriorated significantly in 2015. In January 2016, Quintanilla terminated West's employment. Under his employment contract, West was entitled to a large severance payment unless he was terminated "for cause." Quintanilla claimed he terminated West for cause in part because West had not paid the $7 million he owed under the 2014 Trading Agreement.

In February 2016, Quintanilla sent West a letter demanding "full recovery of all amounts due and owing under" the 2014 promissory note. In April 2016, Quintanilla refused to pay West the final $350,000 installment he owed under the 2015 Purchase Agreement for West's quarterly tax payments, citing West's outstanding debt under the 2014 Trading Agreement. Quintanilla then filed documents asserting a lien against West's assets in the real-property records of McMullen

---

[4] PEP are the initials of one of Quintanilla's financial advisors and board members. The notations on the folder had been scratched out but are still legible.

5

County, where West owned mineral interests. West asserts that, by filing these lien documents, Quintanilla scuttled a deal West had made to sell his mineral interests for $900,000.

West promptly filed this suit claiming that Quintanilla had knowingly and intentionally slandered West's title to the minerals by filing fraudulent liens when he knew that West had fully satisfied the $7 million debt. West also asserted claims for breach of contract, promissory estoppel, and a declaratory judgment that he had satisfied the 2014 debt and that Quintanilla's liens were void. Quintanilla answered the suit, generally denying West's allegations and asserting numerous defenses and counterclaims. Quintanilla denied that the parties had resolved West's 2014 debt and accused West of forging the handwritten notations on the promissory note, security agreement, and folder.

Quintanilla also filed a motion to dismiss West's slander-of-title and fraudulent-lien claims[5] under the Texas Citizens Participation Act (TCPA), asserting that those claims are based on or relate to Quintanilla's exercise of his rights to free speech and to petition. *See* TEX. CIV. PRAC. & REM. CODE § 27.003(a). Among other arguments, Quintanilla asserted that West could not establish prima facie support for his slander-of-title and fraudulent-lien claims because the parol evidence rule applies and precludes West from establishing the March 2015 Sale or any enforceable agreement that satisfied his $7 million debt. The trial court denied the motion, finding that although the TCPA applies to West's slander-of-title and fraudulent-lien claims, West proved

---

[5] Quintanilla did not move to dismiss West's claims for breach of contract, promissory estoppel, and declaratory judgment. Those claims remain in the trial court pending resolution of this interlocutory appeal from the order denying dismissal of the slander-of-title and fraudulent-lien claims.

6

a prima facie case on those claims by clear and specific evidence, and Quintanilla did not establish a valid defense. *See id.* § 27.005 (explaining the TCPA's burden-shifting framework).

On Quintanilla's interlocutory appeal from the order denying his dismissal motion, the court of appeals agreed that the TCPA applied but disagreed that West proved a prima facie case for his claims. *Quintanilla v. West*, 534 S.W.3d 34, 50–51 (Tex. App.—San Antonio 2017). The court agreed with Quintanilla that the parol evidence rule bars West from establishing the March 2015 Sale, and thus West cannot prove that he satisfied the $7 million debt or that Quintanilla's liens were fraudulent or falsely slandered West's title. *Id.* at 49. The court granted Quintanilla's dismissal motion and remanded the case to the trial court for a determination of an award of attorney's fees, costs, and expenses. *Id.* at 51. We granted West's petition for review.

## II.
## The Parol Evidence Rule

To avoid dismissal under the TCPA, West bore the burden to establish by clear and specific evidence a prima facie case for each essential element of his slander-of-title and fraudulent-lien claims. TEX. CIV. PRAC. & REM. CODE § 27.005(c).[6] The only element at issue here is whether

---

[6] Because West does not dispute that the TCPA applies to these claims, we assume for purposes of this appeal that it does, without addressing that issue.

Quintanilla's assertion that West still owes Quintanilla under the 2014 Trading Agreement is false.[7] West argues that he met that burden by pleading and submitting evidence[8] that:

(1)     West fully satisfied his debt under the 2014 Trading Agreement through the March 2015 Sale by giving Quintanilla the right to claim the full $14 million in trading losses and to purchase West's assets for significantly less than their fair market value, and

(2)     Quintanilla discharged and surrendered West's debt when his attorney delivered the 2014 documents marked "paid" and "did not exist," and said "this is all you need" to confirm that West had satisfied his debt.[9]

The court of appeals held, however, that the parol evidence rule bars West's evidence and precludes enforcement of any such agreement. 534 S.W.3d at 49.

When parties have entered into a valid, written, integrated contract, the parol evidence rule precludes enforcement of any prior or contemporaneous agreement that addresses the same subject matter and is inconsistent with the written contract. *First Bank v. Brumitt*, 519 S.W.3d 95, 109–10 (Tex. 2017); *Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469

---

[7] To prevail on his slander-of-title claim, West must show by clear and specific evidence that Quintanilla published a "false and malicious statement made in disparagement of a person's title to property which cause[d] special damages." *Allen-Pieroni v. Pieroni*, 535 S.W.3d 887, 887 (Tex. 2017) (per curiam) (quoting *Marrs & Smith P'ship v. D.K. Boyd Oil & Gas Co.*, 223 S.W.3d 1, 20 (Tex. App.—El Paso 2005, pet. denied)). To prove the filing of a fraudulent lien, West must show that Quintanilla intentionally or knowingly presented for filing a financial statement that he knew "contained a material false statement." TEX. BUS. & COM. CODE § 9.5185(a)(2).

[8] The TCPA directs us to "consider the pleadings and any supporting and opposing affidavits" in "determining whether the plaintiff's claim should be dismissed." *In re Lipsky*, 460 S.W.3d 579, 587 (Tex. 2015) (citing TEX. CIV. PRAC. & REM. CODE § 27.006(a)). We have recently observed that the pleadings are "the best and all-sufficient evidence of the nature of the action." *Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017) (quoting *Stockyard Nat'l Bank v. Maples*, 95 S.W.2d 1300, 1302 (Tex. Comm'n App.)); *see id.* at 468 (holding that movant established application of the Act "[b]y relying on the language used in the . . . pleadings").

[9] Quintanilla vigorously disputes many of West's factual allegations, but at this point we must decide only whether West has established a prima facie case by clear and specific evidence. Prima facie evidence is merely "the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *Lipsky*, 460 S.W.3d at 590 (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (per curiam)). A finding that West has met his TCPA burden does not establish that his allegations are true.

(Tex. 2011); *Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 31 (Tex. 1958). Despite its label,[10] the parol evidence rule precludes enforcement of an alleged agreement, not merely the admission of evidence, and it does so regardless of whether the alleged agreement is oral or written. *Hubacek*, 317 S.W.2d at 31. It is not an evidence rule but a substantive rule of law.[11] *Id.*

Quintanilla contends, and the court of appeals agreed, that the written 2015 Purchase Agreement triggers the parol evidence rule here and precludes West from establishing or enforcing the alleged March 2015 Sale. We hold that the parol evidence rule does not bar enforcement of the alleged March 2015 Sale because the March 2015 Sale was collateral to and consistent with the 2015 Purchase Agreement.

**A. The relevant written contract**

West first argues that the parol evidence rule does not apply because the March 2015 Sale modified the 2014 Trading Agreement, not the 2015 Purchase Agreement. The parol evidence rule, he notes, bars enforcement of prior or contemporaneous agreements; it "does not apply to

---

[10] The term "parol" means "oral" or "unwritten," *Parol*, BLACK'S LAW DICTIONARY (10th ed. 2014) [hereinafter BLACK'S], and "parol evidence" refers to evidence of oral statements, *Evidence*, BLACK'S.

[11] Perhaps because of its label, but also because they are similar and related, the parol evidence rule is easily confused and conflated with the contract-construction rule that bars consideration of parol evidence to modify or add to unambiguous written language. *See David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 448 (Tex. 2008) (per curiam) ("[P]arol evidence cannot modify a written agreement absent ambiguity."). We have on occasion been less than precise in distinguishing the two rules. *See*, *e.g.*, *id.* at 451 ("If a contract is unambiguous, the parol evidence rule precludes consideration of evidence of prior or contemporaneous agreements unless an exception . . . applies."). But key differences exist between the two. The contract-construction rule applies when a contract is written and unambiguous, and it prohibits consideration of oral or extrinsic evidence to modify or add to the contract's terms. *Brumitt*, 519 S.W.3d at 109 ("[T]he construction of an unambiguous contract, including the determination of whether it is unambiguous, depends on the language of the contract itself, construed in light of the surrounding circumstances."). By contrast, the parol evidence rule applies when a contract is written and integrated, and it precludes enforcement of any prior or contemporaneous agreement that is inconsistent with the written contract's terms. *Id.*; *Hubacek*, 317 S.W.2d at 31. This case involves the parol evidence rule, not the contract-construction rule, because West relies on extrinsic evidence to establish a separate, oral agreement (the March 2015 Sale), not to support a particular construction of any written agreement (the CTA or the 2015 Purchase Agreement).

9

agreements made subsequent to the written agreement." *Brumitt*, 519 S.W.3d at 111 (quoting *Lakeway Co. v. Leon Howard, Inc.*, 585 S.W.2d 660, 662 (Tex. 1979)). West contends that because the March 2015 Sale modified, settled, and occurred after the 2014 Trading Agreement, the parol evidence rule simply does not apply.

But we cannot so easily ignore Quintanilla's argument or the court of appeals' reasoning. Quintanilla argues, and the court of appeals concluded, that the parol evidence rule precludes enforcement of the March 2015 Sale because it was contemporaneous with the 2015 Purchase Agreement, not the 2014 Trading Agreement, and the 2015 Purchase Agreement is the contract that West now seeks to alter. As Quintanilla emphasizes, West alleges that he satisfied his $7 million debt "through the March 2015 [S]ale," which included two separate components and "culminated" in the 2015 Purchase Agreement.

West does not dispute that the 2015 Purchase Agreement is the type of contract that triggers the parol evidence rule. It is a written contract that, in light of its "Entire Agreement" provision, is "integrated" in that it is final and complete and expressly "supersede[s]" any prior agreements between the parties "to the extent they relate in any way to the subject matter hereof." *See Integrated Contract*, BLACK'S (defining an integrated contract as "[o]ne or more writings constituting a final expression of one or more terms of an agreement," and a "completely" integrated contract as "a full and exclusive statement of the terms of the agreement").

But by its own terms, the 2015 Purchase Agreement is integrated only as to the parties' agreements relating to the "subject matter" it addresses, not as to all prior or contemporaneous agreements between the parties. Although it is complete and final as to its subject matter, it does not purport to address or supersede agreements related to other matters. *See* RESTATEMENT

10

(SECOND) OF CONTRACTS § 210 cmt. a (1981) (rejecting "the assumption sometimes made that because a writing has been worked out which is final on some matters, it is to be taken as including all the matters agreed upon"). It is in that sense only a partially integrated contract. *See ISG State Operations, Inc. v. Nat'l Heritage Ins. Co.*, 234 S.W.3d 711, 719 n.10 (Tex. App.—Eastland 2007, pet. denied) ("A partially integrated contract is a full and complete expression of the terms contained in that agreement but is not a final and complete expression of all the terms agreed upon between the parties.").

**B. The March 2015 Sale**

Under the parol evidence rule, the written, integrated 2015 Purchase Agreement precludes enforcement of any prior or contemporaneous agreement that addresses the same subject matter and is inconsistent with its terms. *See Brumitt*, 519 S.W.3d at 110. But it does not preclude enforcement of an agreement that is "collateral" to and not inconsistent with the 2015 Purchase Agreement. *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 875 (Tex. 2010); *Sacks*, 266 S.W.3d at 451; *Hubacek*, 317 S.W.2d at 31. A collateral agreement is one that is supported by separate consideration and that the parties "might naturally" make separately under the circumstances. *Hubacek*, 317 S.W.2d at 32 (quoting RESTATEMENT (FIRST) OF CONTRACTS § 240 (1932)); *see also Boy Scouts of Am. v. Responsive Terminal Sys.*, 790 S.W.2d 738, 745 (Tex. App.—Dallas 1990, writ denied) ("To be collateral, the oral agreement must be such as the parties might naturally make separately and would not ordinarily be expected to embody in the writing; further, the allegedly collateral agreement must not be so clearly connected with the principal transaction as to be part and parcel thereof.").

Quintanilla argues that the March 2015 Sale is not collateral to the 2015 Purchase Agreement because West himself asserts that the March 2015 Sale was "directly related" to, "correlated with," and "culminated" in the 2015 Purchase Agreement. But "related" and "correlated" agreements can be collateral. *See ERI Consulting*, 318 S.W.3d at 876 (holding that oral agreement related to written agreement was a collateral agreement). The two agreements at issue here addressed completely different exchanges and obligations. In the March 2015 Sale, according to West, Quintanilla agreed to forgive West's $7 million debt in exchange for West's agreement to allow Quintanilla to claim losses that belonged to West and to sell Quintanilla certain assets at prices below their fair market value. In the 2015 Purchase Agreement, Quintanilla agreed to make certain payments in certain amounts in exchange for those assets. One agreement addressed the satisfaction of a debt, while the other addressed the acquisition of assets.

In this sense, at least, the two agreements do not address the same "subject matter." West pleaded and testified that he satisfied the $7 million debt he owed under the 2014 Trading Agreement "through" the March 2015 Sale,[12] which the parties "structured" and "designed" for

---

[12] Quintanilla argues that West pleaded and testified that he satisfied the debt "through" the 2015 Purchase Agreement, not through the March 2015 Sale. We conclude that West's pleadings and affidavit sufficiently establish otherwise. West defined and used separate terms for the two agreements. First, he asserted that the parties' "negotiations culminated in a transaction that closed on March 1, 2015 (the '**March 2015 Sale**')." He then asserted that the parties "entered into a purchase agreement ('**Purchase Agreement**') with numerous exhibits to effectuate the transfers." Admittedly, his language was not always precise. He stated in his original petition, for example, that "the intent of the Purchase Agreement was to satisfy West's obligations [under the 2014 Trading Agreement] and to allow Quintanilla to utilize the $14.2 Million in losses . . . ." But he clearly and specifically described the March 2015 Sale and the 2015 Purchase Agreement as two distinct agreements, the former involving two components (including his agreement to allow Quintanilla to claim all $14 million in losses) and the latter as a means to effectuate the transactions agreed to in the former. He specifically asserted, "As a result of the March 2015 Sale, Quintanilla received $7,388,879.10 more in value that the nominal values ascribed to the assets in the Purchase Agreement, which was more than enough to satisfy all obligations West owed under the CTA note." And he described the 2015 Purchase Agreement, with all its numerous exhibits, as the means by which they "effectuate[d]" the transfers they agreed to in the March 2015 Sale. We conclude that West's allegations and evidence are sufficiently clear and specific to establish a prima facie case that the 2015 Purchase Agreement was a means to effectuate the parties' broader oral agreement to satisfy West's $7 million debt. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(c); *D Magazine Partners, L.P. v.*

12

that purpose. The subject matter of the March 2015 Sale was the satisfaction of the $7 million debt West owed Quintanilla under the 2014 Trading Agreement. The 2015 Purchase Agreement says nothing about the 2014 Trading Agreement or the $7 million debt.

Quintanilla must concede that the 2014 Trading Agreement is not related to the 2015 Purchase Agreement's subject matter. If it were, the 2015 Purchase Agreement would "supersede" the 2014 Trading Agreement, West would not owe anything under that earlier agreement, and Quintanilla could not file liens or take other actions to collect West's debt. The 2015 Purchase Agreement merely addresses the assets West agreed to sell and Quintanilla agreed to buy, the values and purchase prices the parties agreed to assign to those assets, and the terms of that transaction. Because the 2015 Purchase Agreement does not address the satisfaction of West's $7 million debt, the parol evidence rule does not preclude West from enforcing another agreement that does.

Quintanilla contends, however, that the March 2015 Sale is inconsistent with the 2015 Purchase Agreement because it contradicts both the purchase price and the asset values listed in the 2015 Purchase Agreement. Regarding the purchase price, Quintanilla argues that, under the March 2015 Sale as West describes it, Quintanilla gave more consideration for the assets than the 2015 Purchase Agreement recites. Specifically, the 2015 Purchase Agreement recites that Quintanilla paid just over $4.5 million for the assets, but under the March 2015 Sale, he actually "paid" $4.3 million more than that, in the form of a credit towards the $7 million debt. The court

---

*Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017) ("Clear and specific evidence means that the plaintiff 'must provide enough detail to show the factual basis for its claim.'") (quoting *Lipsky*, 460 S.W.3d at 591).

of appeals agreed that, because of this apparent discrepancy, the terms of the March 2015 Sale are inconsistent with the 2015 Purchase Agreement's terms. 534 S.W.3d at 48–49.

We have never explicitly defined the term "inconsistent" in this context. We have held in some cases that an alleged parol contract was inconsistent with a written agreement. *See, e.g.*, *Sacks*, 266 S.W.3d at 451 (holding that an alleged oral agreement to cap attorney's fees was inconsistent with a written fee agreement that provided only for payment of an hourly rate); *Transamerican Leasing Co. v. Three Bears, Inc.*, 586 S.W.2d 472, 477–78 (Tex. 1979) (holding that an alleged option to purchase leased property for the value of lease payments was inconsistent with the written lease agreement) (citing *Hobbs Trailers v. J.T. Arnett Grain Co.*, 560 S.W.2d 85, 87 (Tex. 1977) (same)). And we have determined in other cases that an oral agreement was not inconsistent with a written contract. In *Hubacek*, for example, we held that an oral agreement to use the proceeds of a written contract in a certain manner was not "inconsistent" with the written contract because it did not vary or contradict the party's obligations under the written agreement. 317 S.W.2d at 33.

More recently, we held in *ERI Consulting* that an alleged oral agreement and a related written contract were "consistent collateral agreements." 318 S.W.3d at 875. The parties in that case, Larry Snodgrass and Mark Swinnea, co-owned both an engineering firm and a partnership that owned a building from which the engineering firm leased office space. *Id.* at 870. They executed a written buy-out agreement through which Snodgrass purchased all the interest in the engineering firm and gave Swinnea all the interest in the real-estate partnership. *Id.* At the same time, they orally agreed that, as "part of the consideration for the buyout," the engineering firm would continue leasing the office space for six years. *Id.* at 870–71. But the written contract did

14

not include the rental payments within the "total consideration." *Swinnea v. ERI Consulting Eng'rs, Inc.*, 236 S.W.3d 825, 834 (Tex. App.—Tyler 2007), *aff'd in part, rev'd in part*, 318 S.W.3d at 870. We held that the oral agreement was a consistent collateral agreement because it addressed the "relationship of several distinct obligations between" the parties and did not "contradict" the written contract. *ERI Consulting*, 318 S.W.3d at 875–76.

In *Hubacek* and *ERI Consulting*, the oral agreements resulted from the same negotiations as the written agreements and addressed related subjects, but they did not vary or contradict the parties' obligations under the written contracts. By contrast, the oral agreements in *Sacks* and *Transamerican Leasing* were inconsistent agreements because they altered fundamental terms of the written contracts.

We conclude that, as in *ERI Consulting*, the collateral oral agreement at issue here (the March 2015 Sale) is consistent with the written contract (the 2015 Purchase Agreement) even if it is construed to provide additional consideration for the sale of West's assets. No doubt, the parol evidence rule can prevent a party from relying on "extrinsic evidence to show that a written instrument was executed for a consideration different from that expressed in the instrument," at least when the consideration is expressed not as "a mere recital" but is "contractual in nature." *Jackson v. Hernandez*, 285 S.W.2d 184, 190 (Tex. 1955); *see also Lakeway*, 585 S.W.2d at 662 ("When the consideration expressed in a writing is contractual in nature, and is not simply a recital of consideration already performed, the parol evidence rule does apply.").

But here, West does not assert that the March 2015 Sale altered the purchase price stated in the 2015 Purchase Agreement or the consideration given for each asset. He agrees that the 2015 Purchase Agreement was enforceable and in fact performed exactly as written: Quintanilla made

15

the payments totaling just over $4.5 million and, in exchange, received the assets listed. Instead, West argues that the parties knew and agreed that Quintanilla would make a substantial profit through the 2015 Purchase Agreement because the assets' value greatly exceeded the agreed purchase price. And through the separate, collateral March 2015 Sale, which addressed an unrelated subject matter, they agreed that Quintanilla would credit that profit towards West's $7 million debt. As with the oral lease agreement at issue in *ERI Consulting*, "if the parties agreed that the [loan credit] was to be additional consideration for the [assets], then such an agreement was a consistent collateral agreement. Nothing in such an agreement would contradict the written contract[]." *ERI Consulting*, 318 S.W.3d at 875–76.

As explained, however, the 2015 Purchase Agreement—or at least the "reference spreadsheet" incorporated into the written agreement—listed not only the purchase price but also an "estimated value" for each asset. *See supra* n.1. According to West, the parties knew that the assets were actually worth significantly more than those listed values, resulting in the substantial profits that Quintanilla credited to the $7 million debt. To the extent Quintanilla argues that the parol evidence rules bars evidence creating that inconsistency, we disagree. "The parol evidence rule applies only to contractual or jural writings evidencing the creation, modification, termination or securing of a particular right or obligation. The rule does not apply to mere statements or recitals of past facts." *Gannon v. Baker*, 818 S.W.2d 754, 755–56 (Tex. 1991). Because the values listed in the 2015 Purchase Agreement are mere recitals that do not affect the contractual obligations described within the agreement, the parol evidence rule does not preclude enforcement of a collateral agreement based on different values.

Finally, Quintanilla argues that the parol evidence rule applies because the March 2015 Sale was neither supported by separate consideration nor the kind of agreement that "might naturally" be made separately under the circumstances. *See Hubacek*, 317 S.W.2d at 32 (quoting RESTATEMENT (FIRST) OF CONTRACTS § 240 (1932)). We disagree. In the March 2015 Sale, as West describes it, West gave up both a right to claim a substantial loss for tax purposes and the substantial value of his assets in exchange for Quintanilla's discharge of the $7 million debt. We fail to see how either party's obligation lacked consideration. And the written 2015 Purchase Agreement memorialized the agreed purchase price for the assets and the complicated details of their ownership transfer, for the benefit of both parties and others affected by those transfers. Considering the purposes for which the parties designed and structured the transactions, at least according to West, we conclude that the "collateral agreement in this case is one which might naturally have been made by parties situated as were petitioner and respondent." *Hubacek*, 317 S.W.2d at 33.

We conclude that the March 2015 Sale, as West describes it, constitutes an agreement that is collateral to and consistent with the 2015 Purchase Agreement and addresses a different subject matter. Although the two agreements are no doubt related and one "culminated" in the other, the March 2015 Sale concerns "the relationship of several distinct obligations" between the parties and "falls within" the consistent-and-collateral exception. *ERI Consulting*, 318 S.W.3d at 875. We hold that, to the extent West is able to ultimately prove the facts for which he has established a prima facie case, the parol evidence rule does not preclude enforcement of the March 2015 Sale.[13]

---

[13] West alternatively argues that, separate from his evidence of the terms of the March 2015 Sale, he has established a prima facie case of falsity through his own testimony that he satisfied the $7 million debt and his evidence (including the original documents with handwritten notes) that Quintanilla surrendered those documents to him,

### III.
### Conclusion

At this stage of the litigation, West need only establish by clear and specific evidence a prima facie case for each essential element of his claims. TEX. CIV. PRAC. & REM. CODE § 27.005(c). For the reasons explained, we hold that the parol evidence rule does not preclude enforcement of the agreement through which West claims to have satisfied his debt to Quintanilla, and that West has thus met his current burden to establish a prima facie case for the falsity of Quintanilla's liens. We do not hold that West has established a prima facie case for every element of his claims. In the court of appeals, Quintanilla also argued that West cannot establish causation or special damages, and that Quintanilla established his defenses by a preponderance of the evidence. *Id.* § 27.005(d). The court of appeals did not reach those issues. We therefore reverse the court of appeals' judgment and remand the case to that court for consideration of issues it did not reach.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: April 5, 2019

---

thereby discharging the debt. *See* TEX. BUS. & COM. CODE § 3.604(a)(1) (permitting discharge of an obligation to pay a negotiable instrument by voluntarily surrendering the instrument to the obligated party). Quintanilla contends that West waived this issue by failing to raise it in the trial court or the court of appeals. And even if not waived, Quintanilla argues that West's evidence is insufficient to establish a prima facie case of discharge under section 3.604. In light of our rejection of the sole basis on which the court of appeals relied to reverse the trial court's order, we need not address these arguments.

Meanwhile, Quintanilla argues that, if we hold (as we do) that the parol evidence rule does not apply, West's reliance on the alleged March 2015 Sale must nevertheless fail because it relies on "past consideration," which is not consideration at all. *See, e.g.*, *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 659 (Tex. 2006) (Jefferson, C.J., concurring) ("It follows that 'past consideration' is not consideration."). But the court of appeals did not address this argument, and as Quintanilla has urged us to do, we are remanding the case to the court of appeals for it to address arguments it did not reach.