COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| MVT SERVICES, LLC, and JUAN GARCIA, | § | No. 08-23-00181-CV |
| Appellants, | § | Appeal from |
| v. | § | 448th Judicial District Court |
| ERIKA ROBLES, INDIVIDUALLY, AS REPRESENTATIVE OF THE ESTATE OF ORLANDO ROBLES, and AS NEXT FRIEND OF K.R.; MARIA CASTILLO; ELAINNA ROBLES; ATHENA SCHMIDT; MELINA ROBLES; BYANCA SANTOS; and PAULINA MERINO ON BEHALF OF O.R.R., | §  §  § | of El Paso County, Texas  (TC# 2022DCV3059) |
| | § | |
| Appellees. | § | |

## MEMORANDUM OPINION

Orlando Robles and Appellant Juan Garcia were hired by OEP Holdings, LLC (OEP), which leased their services to Appellant MVT Services, LLC (MVT) to perform work as truck drivers. Following a collision that led to Orlando's[1] death, his estate and various family members (collectively, the Robles Family) sued Garcia and MVT (collectively, the MVT Appellants) for wrongful death. The MVT Appellants moved to compel arbitration based on OEP's arbitration agreement they contend Orlando signed and they can enforce. The trial court denied the motion,

---

[1] Because many of the Appellees share the same last name, we use Orlando's first name for clarity.

and the MVT Appellants appealed. Because we find that the MVT Appellants did not establish their right to adopt the Plan, we affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 28, 2020, Garcia was driving an 18-wheeler tractor trailer on an interstate highway near Roland, Oklahoma, when he collided with a stopped truck. Orlando was in the sleeper berth at the time and sustained significant injuries, which led to his death.

### A. The Robles Family's lawsuits

After Orlando's death, the Robles Family sued several defendants, including MVT and Garcia, in an Oklahoma state court, where litigation ensued for approximately two years. After settling with the other defendants, the Robles Family dismissed its claims against the MVT Appellants without prejudice. Then in October 2022, the Robles Family brought a wrongful death action against the MVT Appellants in El Paso, where Garcia resided. The Robles Family alleged Orlando's death was caused by Garcia's negligence; MVT was liable for Garcia's negligence based on a respondent superior theory of liability; and MVT was negligent in hiring Garcia. The same month, the MVT Appellants filed a joint answer to the petition, denying the Robles Family's claim and raising, *inter alia*, the affirmative defense of arbitration. They argued Orlando had agreed to resolve "all workplace injury and negligence disputes" through binding arbitration, which agreement was binding on his heirs.

### (1) The MVT Appellants' motion to compel arbitration

In May 2023, the MVT Appellants filed a joint motion to stay proceedings and compel arbitration (motion to compel arbitration), alleging that when Orlando was first hired by OEP, he signed an agreement to arbitrate contained in OEP's Occupational Injury Benefit Plan (the Plan), whereby he agreed to arbitrate all personal injury and wrongful death claims arising from his

2

employment. They alleged MVT had adopted the Plan, giving it the right to enforce the agreement against the Robles Family as Orlando's beneficiaries. The MVT Appellants did not provide a separate analysis in their motion regarding Garcia's right to enforce the agreement.

### (2) The arbitration documents

In their motion, the MVT Appellants attached an affidavit from OEP's Director of Human Resources, John Gregory Ginger, wherein he averred that in lieu of subscribing to the Texas Workers' Compensation System, OEP provides self-funded workplace injury benefits to its employees through its Occupational Injury Benefit Plan. Ginger explained that OEP's Plan offers its employees two coverage options: Tier 2 benefits, which offer a base amount of benefits but are not subject to an arbitration agreement; and Tier 1 benefits, which offer an increased benefit amount in exchange for an agreement to arbitrate certain claims. According to Ginger, when Orlando was hired by OEP, he chose Tier 1 benefits and signed two documents reflecting his agreement to arbitrate workplace injury or negligence claims.

### (a) The SPD and SPD acknowledgment

Ginger attached to his affidavit the "Injury Benefit Plan and Summary Plan Description Acknowledgement" (the SPD Acknowledgment). It purportedly contained Orlando's electronic signature, stating he had been given instructions on how to log into his "paperwork account" to view the "Summary Plan Description (SPD) of the Occupational Injury Benefit Plan of OEP HOLDING, LLC.," and he had reviewed and understood the provisions of the Plan.[2] Ginger also

---

[2] In a supplemental affidavit, Ginger provided a detailed description of OEP's security features used to obtain Orlando's electronic signature, in accordance with the Texas Uniform Electronic Transaction Act. *See* Tex. Bus. & Com. Code Ann. § 322.009. The Robles Family did not challenge the efficacy of those security features and therefore did not rebut the presumption that Orlando's electronic signature on the documents was genuine. *See Solcius, LLC v. Meraz*, No. 08-22-00146-CV, 2023 WL 2261414, at *4–5 (Tex. App.—El Paso Feb. 27, 2023, no pet.) (mem. op.) (finding electronic signature on contract was genuine where party disputing its validity did not challenge the security features used to obtain it) (citing *Aerotek, Inc. v. Boyd*, 624 S.W.3d 199, 204 (Tex. 2021)).

attached to his affidavit a copy of the SPD, which described two tiers of coverage and provided that participants electing to receive Tier 1 benefits (Tier 1 Participants) agree to resolve any disputes regarding "covered claims," including workplace injuries, under the terms of the arbitration agreement set forth therein.[3] The SPD contained several provisions relating to arbitration, including "Arbitration is the Exclusive Remedy for Covered Claims," which provides:

> Covered Claims shall be exclusively resolved by binding arbitration. While both Tier 1 Participants and Company retain all substantive legal rights and remedies under this Agreement, Tier 1 Participants and Company are both waiving all rights which either may have with regard to trial, whether jury or non-jury, in state or federal court for any Covered Claim.

The SPD defines "covered claims" as "any personal injury suffered by Tier 1 Participants while in the Course and Scope of their employment with Company, including but not limited to, claims for negligence, gross negligence, physical impairment, disfigurement, pain and suffering, mental anguish, wrongful death [and] survival actions" and any expenses and damages "arising out of or related to personal any injury." The term "Company" is defined as "OEP and each of its affiliates, related entities, subsidiaries, officers, directors, and employees." A "Tier 1 Participant" is defined as "a person who is employed by Company, has a Covered Claim and has elected to receive Tier 1 benefits under this Plan" and expressly included "a Tier 1 Participant's spouse, children, parents, estate, successors and assigns."

The SPD provides that the "Company and Tier 1 Participant intend and expressly agree that any Covered Claim of Company's officers, directors, agents, predecessors, successors, and affiliated companies that arises from, relates to, or is derivative of any Covered Claim of Company,

---

[3] We note that the Plan was not a contract of employment as contemplated by 9 U.S.C. § 1, which exempts from mandatory arbitration "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," including truck drivers. *See* 9 U.S.C. § 1 (". . . nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."); *In re Swift Transp. Co., Inc.*, 311 S.W.3d 484, 488–89 (Tex. App.—El Paso 2009, no pet.) (noting that truck drivers engaged in interstate commerce fall within the § 1 exemption).

4

shall be resolved according to the terms and conditions of this Agreement."[4] And finally, the SPD contains a provision with the heading "ADOPTION OF PLAN BY AFFILIATED CORPORATION," which states:

> **Affiliated Entities.** An affiliated corporation or other entity to the Company may, with the approval of the Company, adopt this Plan by agreeing to be bound as a Company by limitations in this Plan, as applied to its eligible Participants, except as to those terms, if any, specifically described in the adopting resolutions or agreement.

In his first affidavit, Ginger averred that he was familiar with OEP's "affiliated companies who have adopted our Plan and have agreed to be bound as a Company by the limitations of our Plan" and that "MVT is one of our affiliated companies that has agreed to be bound by our Plan." In a supplemental affidavit, Ginger attached copies of three documents that he asserted were maintained as OEP business records, all of which were labeled "Unanimous Consent of Sole Member and Managers of MVT Services, LLC. on Lieu of Annual Meeting." The documents, the first of which was dated July 1, 2019, approximately a year before Orlando's accident, resolved that "MVT Services, LLC, hereby adopts the OEP Holdings, LLC Work Related Injury Benefit Plan 502, and its Amendments."[5] Ginger expressed his opinion that MVT was "entitled to enforce its right to compel arbitration against the claims asserted as a result of [Orlando's] death while [Orlando was] in the course and scope of his employment."

### (b) The Tier 1 election document

The other document Ginger attached to his affidavit was a copy of a document entitled "OEP Holdings, LLC and Affiliates' Occupational Injury Benefit Plan and Agreement to Arbitrate

---

[4] The SPD also states: "Company and Tier 1 Participant intend and expressly agree that any Covered Claim of Claimant's spouse, children, parents, estate, successors and/or assigns that now exists or that may come into existence in the future which arises from, relates to, or is derivative of any Covered Claim, shall be resolved according to the terms and conditions of this Agreement."

[5] The two remaining documents were dated December 2020 and January 2022.

Election" (the Tier 1 election), which also purportedly contained Orlando's electronic signature and was dated the same day of his initial hire. The Tier 1 Election provided:

> I understand that OEP Holdings, LLC and its affiliates ("OEP") have adopted an Occupational Injury Benefit Plan ("Plan") that offers Participants, subject to the terms and conditions of the Plan two tiers of no-fault benefits for injuries that they may suffer at work. I also understand that in order to receive the higher tier of benefits (Tier l), that OEP and I agree to resolve any disputes regarding workplace injuries under the terms and conditions of the Agreement to Arbitrate a copy of which I have been provided.

> I understand that my election to receive the higher level of benefits in the Plan and to agree to the terms of the Agreement to Arbitrate is voluntary and optional on my part, but once I elect, the election is irrevocable. I understand that whether I elect to receive the higher level of benefits and agree to arbitrate or not does not change my employment status or alter the terms of my employment. I understand that electing to receive the higher level of benefits is not a condition of employment with OEP.

### (3) The parties' arguments in the trial court

The Robles Family opposed the motion to compel arbitration, arguing: the MVT Appellants did not establish that Orlando's signature was genuine or that the family's claims came within the scope of the agreement; the agreement was illusory; OEP breached the Plan by not offering the Robles Family benefits, thus voiding the arbitration provision; the MVT Appellants were estopped from arguing the Plan applies to their claims based on their contrary position in the Oklahoma litigation; and the MVT Appellants impliedly waived their right to arbitrate by substantially invoking the judicial process. The Robles Family also argued the MVT Appellants failed to present any evidence that either Orlando or Garcia were "employees" of the Company within the meaning of the Plan's arbitration agreement. Finally, the Robles Family argued the MVT Appellants were nonsignatories to OEP's plan and arbitration agreement, and because MVT provided no evidence that the parties intended its inclusion—other than a conclusory statement that it was an "affiliated" company that adopted the Plan—the family had no right to enforce the arbitration agreement.

6

### (4) The trial court's decision

Following a hearing, the trial court issued its order denying the MVT Appellants' motion to compel arbitration without issuing findings of fact or conclusions of law. The MVT Appellants then filed this accelerated interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.016; 9 U.S.C. § 16(a)(1)(B). On appeal, the MVT Appellants raise one global issue with multiple subparts, claiming the trial court erred by denying their motion to compel arbitration.

### PRELIMINARY EVIDENTIARY CONSIDERATIONS

In the trial court, the MVT Appellants attached several exhibits from the Oklahoma litigation in their reply in support of their motion to compel arbitration, which the Robles Family contends we should not consider in our analysis based on improper authentication.[6] We address the only two challenged exhibits relevant to our analysis.

The first relevant document is Raul Garcia's (MVT's Director of Legal Services) affidavit in which he explains the relationship between OEP and MVT. We conclude that we may consider this affidavit, as it was a self-authenticated document under Texas Rule of Evidence 902(8) and Texas Government Code §312.011(1). *See* Tex. R. Evid. 902(8) (evidence that is self-authenticating includes "[a] document accompanied by a certificate of acknowledgment that is lawfully executed by a notary public or another officer who is authorized to take acknowledgments"); Tex. Gov't Code Ann. § 312.011(1) (outlining the statutory requirements of an affidavit as a signed, written statement of facts sworn to before an officer authorized to administer oaths and certified under his seal). To his affidavit, Garcia attached the "OEP and MVT

---

[6] The Robles Family did not object to the admissibility of these exhibits in the trial court, but we may nevertheless consider their argument that the documents were not authenticated, as unauthenticated documents may not be used to support a motion to compel arbitration, and in turn, we may not consider unauthenticated documents in our analysis. *Hernandez v. Gallardo*, 594 SW.3d 341, 345 (Tex. App.—El Paso 2014, pet. denied) (recognizing that "[a] complete absence of authentication is a defect of substance which may be raised for the first time on appeal").

7

Services Staff Leasing Agreement" signed on January 1, 2013 (the Leasing Agreement), which he attested was a "true and correct copy of a business record" held by MVT.[7] We find that we may also consider this document, as it was properly authenticated through Garcia's attestation. *See In re Estate of Guerrero*, 465 S.W.3d 693, 704 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (recognizing that a properly sworn affidavit stating that "the attached documents are true and correct copies of the original authenticates the copies" so that the copies are admissible in evidence) (citing *Republic Nat'l Leasing Corp. v. Schindler*, 717 S.W.2d 606, 607 (Tex. 1986) (per curiam)).

Second, for the same reasons, we find the affidavit of Rosanna Castro, MVT Services' Director of Safety, in which she described the duties that Orlando and Garcia were performing on the day of the accident, is an admissible self-authenticating document. We will therefore consider her affidavit in our analysis as well.

## STANDARD OF REVIEW AND APPLICABLE LAW

A defendant seeking to compel arbitration carries the burden of proving that a valid arbitration agreement exists and that the plaintiffs' claims fall within the agreement's scope. *In re Rubiola*, 334 S.W.3d 220, 223 (Tex. 2011) (orig. proceeding). Courts determine whether an arbitration agreement exists by applying "ordinary principles of state contract law." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738 (Tex. 2005) (orig. proceeding). Thus, to demonstrate the existence of a binding arbitration agreement, the moving party is required to show "(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4)

---

[7] The MVT Appellants also submitted documents from the Oklahoma litigation they claimed supported a finding that the Robles Family made judicial admissions in the Oklahoma court that Orlando had signed the arbitration agreement. On appeal, the MVT Appellants argue the documents were admissible, and they filed a motion requesting that we take judicial notice of the documents. Because we need not address those documents in our analysis, we deny as moot MVT's motion to take judicial notice.

8

each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding." *APC Home Health Services, Inc. v. Martinez*, 600 S.W.3d 381, 389 (Tex. App.—El Paso 2019, no pet.). "The trial court's determination of the arbitration agreement's validity is a legal question subject to de novo review." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003) (citing *In re Kellogg Brown & Root*, 80 S.W.3d 611, 615 (Tex. App.—Houston [1st Dist.] 2002, orig. proceeding)).

If the proponent of arbitration offers prima facie evidence of a valid agreement that covers the parties' dispute, a presumption arises in favor of arbitrating the dispute, and the burden shifts to the resisting party to raise an affirmative defense to enforcing that agreement. *APC Home Health*, 600 S.W.3d at 388 (citing *Ridge Nat. Resources, L.L.C. v. Double Eagle Royalty, L.P.*, 564 S.W.3d 105, 118 (Tex. App.—El Paso 2018, no pet.); *Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 499 (Tex. 2015); *In re Poly–America, L.P.*, 262 S.W.3d 337, 348 (Tex. 2008) (orig. proceeding)). Absent evidence of a valid defense, the trial court must compel arbitration. *J.M. Davidson*, 128 S.W.3d at 227.

The Robles Family contested the validity of the arbitration agreement and its scope, asserted several defenses to the enforcement of the arbitration agreement, and challenged the MVT Appellants' right to enforce the agreement. Because the trial court did not provide findings of fact or conclusions of law, we must uphold the trial court's decision on any appropriate legal theory urged below. *APC Home Health Services*, 600 S.W.3d at 389 (citing *Bonded Builders Home Warranty Assn. of Texas v. Rockoff*, 509 S.W.3d 523, 531–32 (Tex. App.—El Paso 2016, no pet.)).

### THE MVT APPELLANTS AND THE RIGHT TO COMPEL ARBITRATION

Because our analysis turns on whether MVT was an affiliated corporation to OEP entitled to adopt OEP's Plan, we will address only that argument and assume without deciding that the

9

arbitration agreement between OEP and Orlando was valid and that the Robles Family's claims fall within its scope. We therefore begin and end our analysis with the MVT Appellants' argument that MVT was entitled to adopt the Plan.

### A. Applicable law

In general, only the parties to an arbitration agreement may compel arbitration. *See G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 524 (Tex. 2015). However, an arbitration obligation may also bind a nonsignatory under principles of contract law and agency. *In re Rubiola*, 334 S.W.3d at 224 (citing *In re Kellogg Brown & Root*, 166 S.W.3d at 738). As relevant here, "signatories to an arbitration agreement may identify other parties in their agreement who may enforce arbitration as though they signed the agreement themselves." *Id.* at 226. Whether an arbitration agreement can be enforced by a nonsignatory depends on the parties' intent as expressed in their agreement. *Id.* at 224. The question of the parties' intent in allowing a nonsignatory to enforce an arbitration agreement is critical "because a party cannot be forced to arbitrate absent a binding agreement to do so." *Jody James Farms, JV v. Altman Group, Inc.*, 547 S.W.3d 624, 632 (Tex. 2018) ("The involvement of a non-signatory is an important distinction because a party cannot be forced to arbitrate absent a binding agreement to do so.").

In construing a contract and the parties' intent expressed therein, "[courts] examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). If the contract "can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Id.* (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). But if the

10

contract is subject to "two or more reasonable interpretations after applying the pertinent rules of construction," it is ambiguous, creating a fact issue on the parties' intent. *Id.*

### B. The MVT Appellants' arguments

As set forth above, OEP's Plan contains a provision entitled, "Adoption of Plan by Affiliated Corporation," which states: "[a]n affiliated corporation or other entity to the Company may, with the approval of the Company, adopt this Plan by agreeing to be bound as a Company by limitations in this Plan, as applied to its eligible Participants, except as to those terms, if any, specifically described in the adopting resolutions or agreement." The MVT Appellants—despite being nonsignatories to the Plan and arbitration agreement contained therein—maintain that they can compel arbitration because MVT adopted OEP's Plan in accordance with the Plan's requirements, pointing to the various resolutions MVT passed proclaiming their intent to do so. In turn, they contend that Garcia, as an MVT employee, also adopted the Plan—an argument they did not make in the trial court—and they are therefore both entitled to enforce the arbitration agreement against the Robles Family.[8] However, before demonstrating that it properly adopted the Plan, MVT first had to show that it was an "affiliated corporation or other entity to the Company," thereby giving it the right to do so. For the reasons set forth below, we conclude it did not.

---

[8] In their reply brief, the MVT Appellants argue for the first time that Garcia is independently entitled to enforce the agreement because (1) Orlando agreed to arbitrate any work-related claims with the Company, (2) the Plan defines the term "Company" to include its employees, and (3) Garcia was an employee of the Company. We will not consider this argument in our analysis, as a party may not raise an argument for the first time in a reply brief. *See, e.g., Blair v. Blair*, 642 S.W.3d 150, 155, n. 2 (Tex. App.—El Paso 2021, no pet.) (citing *Watret v. Watret*, 623 S.W.3d 555, 563–64 (Tex. App.—El Paso 2021, no pet.) (recognizing that Rule 38.3 of the Texas Rules of Appellate Procedure restricts reply briefs to addressing only matters raised in appellee's brief and may not be utilized to present a new issue to the court)).

11

### (1) The express terms of the agreement prevail.

Because the Plan does not define the term "affiliated," we apply its common, ordinary meaning, which we determine by looking to dictionary definitions then considering the term's use in other authorities. *Anadarko Petroleum Corp. v. Houston Cas. Co.*, 573 S.W.3d 187, 192 (Tex. 2019); *see also Van Dyke v. Navigator Group*, 668 S.W.3d 353, 359 (Tex. 2023), reh'g denied (June 16, 2023) ("Unless otherwise defined in the text, courts will adopt a term's ordinary meaning.") (citing *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763–64 (Tex. 2018)). "Affiliate" generally means "a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." Black's Law Dictionary (11th ed. 2019). Webster's defines "affiliate" as "an affiliated person or organization" and then defines "affiliated" as "closely associated with another typically in a dependent or subordinate position." Affiliate, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/affiliate (last visited April 16, 2024).

"Affiliate" is also defined in the Texas Business Organizations Code as "a person who controls, is controlled by, or is under common control with another person." Tex. Bus. Orgs. Code Ann. § 1.002(1). Several courts have defined the term "affiliate," when it is not otherwise defined by contract or statute, to similarly mean a corporation that is related to another corporation through its shareholdings or other means of control, such as through a parent and subsidiary relationship. *See, e.g.*, *McLane Foodservice, Inc. v. Table Rock Restaurants, L.L.C.*, 736 F.3d 375, 378 (5th Cir. 2013) (applying Texas law to define "affiliate" as "a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation"); *see also Vision Capital Real Estate, LLC v. Wurzak Hotel Group*, No. 05-15-00917-CV, 2016 WL 6093977, at *4 (Tex. App.—Dallas Oct. 19, 2016, no pet.) (mem. op.) (defining

12

"affiliate" as a "corporation that is related to another corporation by shareholdings or other means of control" and as a "company effectively controlled by another or associated with others under common ownership or control" (quoting *Eckland Consultants, Inc. v. Ryder, Stillwell Inc.*, 176 S.W.3d 80, 88 (Tex. App.—Houston [1st Dist.] 2004, no pet.)); *Wharton Physician Services, P.A. v. Signature Gulf Coast Hosp., L.P.*, No. 13-14-00437-CV, 2016 WL 192069, at *5 (Tex. App.—Corpus Christi–Edinburg Jan. 14, 2016, no pet.) (mem. op.) (defining "affiliate" as a "corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation" and "more broadly as closely associated with another typically in a dependent or subordinate position" (internal quotation marks omitted)).

MVT argues that the Plan does not just allow "affiliated corporations" to adopt the Plan, but instead provides that "[a]n affiliated corporation or *other entity* to the Company" may adopt the Plan (emphasis added). MVT reads "other entity" in isolation, without any supporting argument or authority, and contends that at the least, it should be considered an "other entity" to OEP. We do not read the Plan language to present two types of entities that may adopt the Plan, i.e., "an affiliated corporation" and an "other entity." Instead, we understand from the clear language of the agreement that affiliated corporations and affiliated other entities may adopt the Plan. *See* BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 130 (Scalia & Garner 2012) ("Series-Qualifier Canon: When there is a straightforward, parallel construction that involves all nouns . . . in a series, a prepositive . . . modifier normally applies to the entire series."); *Iliff v. Iliff*, 339 S.W.3d 74, 80 (Tex. 2011) (interpreting the word "intentional" as modifying both unemployment and underemployment in statute stating "intentional unemployment or underemployment").

13

**(2)  There is no evidence of affiliation in the record.**

We next look to the record to determine whether MVT provided evidence of affiliation, e.g., evidence that OEP controlled MVT or that the two were related by means of common control or ownership. MVT's only "evidence" of affiliation was from OEP's Human Resources Director, John Gregory Ginger, who averred that "MVT Services is one of [OEP's] affiliated companies . . . . " While Ginger could speak to MVT's adoption of the Plan based on OEP's business records and his familiarity with the same, he offered no basis for concluding that the Plan gave MVT the authority to adopt the plan in the first instance, i.e., MVT's affiliate status. *See In re Macy's Texas, Inc.*, 291 S.W.3d 418, 419 (Tex. 2009) (per curiam) ("On that issue the affidavit was conclusory rather than conclusive, failing to establish any basis for the affiant's knowledge of corporate structure or attach any supporting documents whatsoever[]" speaking to affiliation).

The evidentiary standards for a motion to compel arbitration are the same as for a motion for summary judgment. *Fitness Entm't Ltd. v. Hurst*, 527 S.W.3d 699, 704 (Tex. App.—El Paso 2017, pet. denied) (citing *In re Jebbia*, 26 S.W.3d 753, 756–57 (Tex. App.—Houston [14th Dist.] 2000, orig. proceeding)). It is well-established that a court will not consider a conclusory affidavit as evidence in support of either a motion for summary judgment or a motion to compel arbitration. *See Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996) (discussing conclusory affidavits in the summary judgment context); *TMI, Inc. v. Brooks*, 225 S.W.3d 783, 794 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (discussing conclusory affidavits in the context of a motion to compel arbitration). A "conclusory statement" in an affidavit "is one that does not provide the underlying facts to support the conclusion." *Cnty. of El Paso v. Aguilar*, 600 S.W.3d 62, 77 (Tex. App.—El Paso 2020, no pet.). "Conclusory affidavits are not enough to raise fact issues," as "[t]hey are not credible, nor susceptible to being readily controverted." *Ryland Group,*

14

*Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996). Therefore, conclusory statements in an affidavit "cannot support a judgment even when no objection was made to the statements at trial." *Kmart Stores of Tex., L.L.C. v. Ramirez*, 510 S.W.3d 559, 567 (Tex. App.—El Paso 2016, pet. denied) (quoting *Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004)).

In sum, the Plan defines "Company" as "OEP and each of its affiliates, related entities, subsidiaries, officers, directors and employees." Because the Plan does not define the term "affiliates," we apply the common definition of affiliate, as set forth above. And there is no evidence in the record to show MVT falls within that definition.

### (3) Parol evidence may not vary the Plan's unambiguous terms.

MVT contends we should nevertheless consider how a completely separate arbitration agreement pertaining to different claims defines affiliates, which it asserts Orlando also signed at the time he was hired by OEP (the Mandatory Arbitration Agreement), when determining how to define the term "affiliate" in the Plan documents. The Mandatory Arbitration Agreement, in which Orlando agreed to arbitrate employment-related claims with OEP,[9] specifically defines the term "affiliate" to mean "companies controlling, controlled by or under common control with OEP," as well as "any and all client companies to which any Employee is assigned to perform work."[10]

---

[9] The Mandatory Arbitration Agreement was part of Orlando's employment contract. The Robles Family points out, and we agree, that employment contracts involving truck drivers, such as Orlando, are exempt from mandatory arbitration under the FAA's transportation-worker exemption found in 9 U.S.C. § 1.

[10] To this point, the Robles Family posits that "[i]f the definition of 'affiliate' in the Mandatory Arbitration Agreement had the same meaning in [the Plan documents], OEP could have easily accomplished this by placing that definition in [the Plan documents]." We agree. We take OEP's failure to include client corporations in the Plan documents' definition of affiliates—and in specifying what companies were entitled to adopt the plan—as purposeful. *See generally Transcon. Gas Pipeline Corp. v. Texaco, Inc.*, 35 S.W.3d 658, 667 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (where oil company excluded unproduced gas from excess-royalty coverage in an earlier document, thereby establishing that it knew how to create an exclusion, court found that its failure to do so in subsequent agreement was purposeful) (citation omitted).

As the Robles Family points out, the Plan contains an integration clause providing that the "Arbitration Agreement is (1) the 'complete agreement' (2) that 'supersedes any other agreement regarding arbitration of Covered Claims,'" which includes personal injury and wrongful death claims such as the Robles Family's claims. MVT therefore cannot rely on other documents Orlando may have signed to impact terms of the Plan's arbitration provisions. *See generally West v. Quintanilla*, 573 S.W.3d 237, 243 (Tex. 2019) ("when parties have entered into a valid, written, integrated contract, the parol evidence rule precludes [a court from considering] any prior or contemporaneous agreement that addresses the same subject matter and is inconsistent with the written contract").

Moreover, because we find no ambiguity in the Plan's terms regarding who may adopt the Plan, MVT may not rely on parol evidence to vary its terms. "An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (citing *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951)). Only when a contract is ambiguous may a court consider the parties' interpretation and "admit extraneous evidence to determine the true meaning of the instrument." *Id*. at 450–51 (citing *Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curiam)); *see also Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 483 (Tex. 2019) ("The parol evidence rule bars consideration of evidence that contradicts, varies, or adds to the terms of an unambiguous written agreement."). While "evidence of circumstances can be used to 'inform the contract text and render it capable of only one meaning,' extrinsic evidence can be considered only to interpret an *ambiguous* writing, not to create ambiguity." *Barrow-Shaver Res. Co.*, 590 S.W.3d at 483

16

(citing *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (emphasis added) (citations omitted)).

We therefore conclude that the MVT Appellants did not establish their right to enforce the arbitration agreement against the Robles Family. Accordingly, the trial court did not err by denying the motion to compel arbitration.

The MVT Appellants' sole issue on appeal is overruled.

## CONCLUSION

We affirm the trial court's judgment denying the motion to compel arbitration and remand the matter to the trial court for further proceedings consistent with our opinion.

LISA J. SOTO, Justice

June 17, 2024

Before Alley, C.J., Palafox and Soto, JJ.

17